# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 38491

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF PARENTAL RIGHTS OF JOHN (2011-02) DOE.<br>----------------------------------------------------------<br><br>IDAHO DEPARTMENT OF HEALTH & WELFARE,<br><br>   Petitioner-Respondent,<br><br>v.<br><br>JOHN (2011-02) DOE,<br><br>   Respondent-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Boise, June 2011 Term<br><br>2011 Opinion No. 85<br><br>Filed: July 12, 2011<br><br>Stephen W. Kenyon, Clerk |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Honorable Carolyn M. Minder, Magistrate Judge. Honorable Mark A. Beebe, Magistrate Judge.

The judgment of the magistrate court is <u>affirmed</u>.

Fletcher & West, LLP, Boise, for appellant. Jefferson H. West argued.

Honorable Lawrence G. Wasden, Attorney General, Boise, for respondent. Marcy J. Spilker argued.

_____

J. JONES, Justice.

John Doe appeals the magistrate court's judgment terminating his parental rights to his three minor children. We affirm.

## I.

## Factual and Procedural History

The magistrate court found that Appellant, John Doe (Father), neglected his children by (1) failing to provide them with proper parental care within the meaning of I.C. § 16-1602(25)(a), and (2) being unable to discharge his parenting responsibilities under I.C. § 16-1602(25)(b). The court found it to be in the children's best interests to terminate his parental

rights because, although there is a bond between Father and the children, the children need a stable environment that Father cannot provide.

Father is the biological father of three minor children: M.V. (approximately 14 years old), D.B. (approximately 13 years old), and A.B. (approximately 12 years old). Father has had primary custody of the children since approximately 2000, when their mother (Mother) took the children to social services in Virginia. Mother continues to reside in Virginia and is not challenging the termination of her parental rights.

Father brought the children to Idaho in approximately 2008. Mother has not seen the children since the summer of 2009 when they visited her in Virginia. Mother returned the children to Father in Idaho "because they were so violent and disruptive in her home. She said that they 'destroyed' her house putting holes in the walls, etc."

Shortly after the children's return to Idaho, Father was arrested on domestic violence charges for assaulting his then-girlfriend, Bambi, in the presence of his children. After the arrest, Bambi took the children to the residence of Karrie Lytle (Lytle), the girlfriend of Father's nephew, James Dixon. However, Lytle called the Department of Health and Welfare (the Department) on October 22, 2009, because she was unable to further care for the children. Lytle claimed M.V. assaulted her own daughter, giving her a black eye, and claimed "she could no longer care for the children due to their violent outbursts." The children were declared to be in imminent danger and placed in temporary foster care. On October 26, 2009, the Department filed a Child Protective Act petition, requesting that the children be placed in its custody. A shelter care hearing was held that same day, with Father present, and on November 3 the court entered an order granting the Department temporary custody of the children on grounds of neglect. An adjudicatory hearing was held on November 12, which Father failed to attend, resulting in an Order of Legal Custody as to Father.

The Department created a case plan for Father in December of 2009, which addressed four main areas of concern, including: (1) unstable housing and income; (2) violence while under the influence of alcohol; (3) Father's strict disciplinary practices; and (4) failure to address the children's health and educational needs. The corresponding tasks regarding these concerns required the following: (1)(a) Father must obtain and maintain a safe and stable home for himself and his children, submit to random home visits conducted by the Department, and not allow unapproved guests to stay the night at the home; (1)(b) Father must maintain employment and a

source of "legitimate income" that is sufficient to support himself and his children, and provide documentation of this income; (1)(c) Father must complete an approved domestic violence evaluation and comply with its recommendations; (2) Father must complete an approved substance abuse assessment and follow treatment recommendations, and submit to random drug testing; (3) Father must complete an approved parenting class and demonstrate his learned skills during visits with the children; and (4) Father must attend medical, dental, educational, and counseling appointments for his children, maintain regular contact with the children's service providers, and cooperate with them to ensure the children's needs are being met. The magistrate court held a hearing on Father's case plan on December 21, which Father failed to attend, and the case plan was approved in January 2010. The case plan was further amended in May of 2010 to require Father to participate in a family group decision-making meeting, and to provide the Department with contact information for Father's siblings, cousins, aunts, and uncles.

In February 2010, Father completed a Risk to Child Assessment with Camilla Cafferty (Cafferty) in order to satisfy the Department's domestic violence evaluation task. This assessment identified "a history of neglectful and under-involved parenting" by Father and a denial and minimization of domestic violence, substance abuse, and anger management issues. The assessment report indicates that Father moved the children on a regular basis to the homes of his then-girlfriend. However, these relationships would end abruptly due to "an argument fueled with alcohol," leaving the family without a place to live and disrupting the children's living environment. The report also notes that Father's incarceration, as well as the placement of the children in Lytle's care after his arrest, "suggest neglect and an escalation of neglect resulting in the childrens' placement in foster care." The report indicates that Father did not accept responsibility for the children's placement in the custody of the State, which "suggests that he is in extreme denial and minimizes his lack of responsibility for protectively parenting his children." Father also expressed his expectation that M.V. "make meals and care for the younger children."

During the assessment, Father admitted to a history of drug and alcohol abuse and poor impulse control, particularly with regard to liquor. At the time of the report, Father had not completed the recommended substance abuse evaluation. Father suggested that he could continue to be around alcohol and could quit cold turkey, even though he admitted that his violent tendencies were generally associated with drinking. The report indicates that Father's own

-3-

admission to substance abuse and continued noncompliance with treatment recommendations "displays extreme denial and minimization of his substance abuse issues." Furthermore, Father indicated that he does not have anger issues and that others provoke him, despite his admissions to several previous assaults. The report concludes that Father's denial of his anger management and domestic violence problems present serious issues of denial and minimization.

The assessment report recommended that Father address his lack of accountability by completing: (1) cognitive self-change programs, (2) parenting programs for behaviorally disordered children, (3) protective parenting classes, (4) a 52-week domestic violence treatment program, (5) a psychological evaluation, and (6) a substance abuse evaluation.

The magistrate court held a permanency hearing on September 30, 2010, and, despite Father's objections, issued an order on October 7 approving adoption as the permanent plan for the children. In its findings, the court noted that Father had made little progress on his case plan. The children's guardian ad litem, Lynn Mattison (Mattison), recommended in her permanency report to the court that it was not in the best interest of the children to return them to Father because he had not completed a significant portion of his case plan at that time.

In April 2010, Father completed a substance abuse evaluation with Sue Salmon (Salmon), after failing to show up for his first two appointments. Salmon's report indicates that Father only felt the need to address his substance abuse issues because of pressure by the State:

> [Father's] responses indicate minimal motivation for treatment, which suggests that motivational problems are of high clinical significance for treatment planning, and some resistance to treatment. [Father] agrees to treatment because of his CPS case. He does not think he needs treatment for ongoing support for abstinence.

It was recommended that Father attend an outpatient treatment program, complete anger management and parenting classes, and comply with his case plan. Father enrolled in an out-patient treatment program but was discharged for failing to attend a single group meeting over a thirty-day period.

The State filed a petition to terminate Father's parental rights in November of 2010. At the subsequent trial, the children's guardian ad litem testified that, although Father loves his children very much, and they love him, they continue to live in a "very chaotic existence" requiring repeated moves and stays with Father's then-girlfriend, they have inconsistent school attendance, and they have never had dental care. Mattison further testified that, even if the

children were not able to find adoptive families, foster care would be preferable because "there is some structure and consistency and predictability that their lives would have that they wouldn't have if they were with their father."

All three children have documented behavioral problems, which "place them at a higher risk for future neglect and abuse" due to their heightened needs for help and support. Specifically, M.V. exhibits violent tendencies, including destroying property and assaulting other children. M.V. has been involved in the juvenile correction system with charges of fighting and shoplifting, and violated her probation as recently as October of 2010 for threatening staff at her shelter. M.V. was also diagnosed by psychologist Kimberly Parks (Parks) as a sexual abuse child victim,[1] and was also diagnosed with disruptive behavior disorder. D.B. "has been diagnosed with adjustment disorder with mixed anxiety and depressed mood . . . ." D.B. has also had two instances of engaging in conduct at school that would constitute sexual harassment. Finally, A.B. exhibits physically and verbally aggressive behavior towards others, and Parks testified that A.B. is diagnosed with "an adjustment disorder with mixed disturbance of emotions and conduct."

Parks testified that both D.B. and A.B.'s disorders are impacted by the added stress of foster care. Parks also testified that all the children were struggling with being in foster care, and that all three children have expressed an interest in reuniting with their Father. In fact, M.V. testified that she did not want Father's rights to be terminated and that she wants to live with him. She testified that her father is a good person, has quit swearing, and that "everything was just fine when we were all a family."

However, the children indicated that prior to their custody with the State, they had never been to a dentist or doctor. Since visiting a doctor, M.V. has been identified as suffering from gastroesophageal reflux disease (GERD), and signs of pre-diabetes. M.V. had nine fillings since entering the State's custody. Furthermore, all three children are at least one grade level behind in school.

Father's probation officer, Rick Lopez (Lopez), testified regarding Father's criminal record, which included the following: arrest for domestic battery in April of 2009 and in September of 2009; resisting an officer in 2008; misdemeanor larceny in 1998; contempt of court in 1999; trespassing in 1999; possession of marijuana in 1999; and an assault and battery in 1999

---

[1] M.V.'s sexual abuse is said to have occurred while Father lived with a girlfriend whose son sexually molested M.V. It is this ex-girlfriend that Father was living with at the time of the termination hearing, although her son no longer resided with the mother.

that was amended to a domestic assault. Lopez also testified that Father admitted to having a problem with alcohol and was required to submit to random urine analyses, three of which he completed successfully, but all of which were performed several days after being notified of the required test. Lopez indicated that as of July 2010, Father was not in compliance with the terms of his probation due to his failure to complete a domestic violence treatment program. Cory Cook (Cook), a licensed clinical social worker and substance abuse counselor, testified that it was only after notifying Lopez that Father had not yet enrolled in treatment that Father finally enrolled in a 52-week domestic violence program. At the time of the termination hearing, Father had attended three sessions and, although Cook testified that there was no reason to believe Father could not finish the treatment program, Cook was unwilling to recommend that Father be the primary caregiver or be allowed unsupervised visitation with the children.

Cafferty, who conducted the risk assessment, testified at trial about the findings in the assessment report. She stated that Father's profile "reflected a high risk for continued maltreatment and neglect of his children" because of his history of domestic violence, the reports of neglect and maltreatment, and a lack of accountability and responsibility on Father's behalf.

The family's case worker, Julie Stadler (Stadler), also testified at trial, recommending that Father not be reunited with his children. Stadler testified that Father did not make meaningful and timely progress on his case plan. She further testified that termination was in the best interest of the children because Father is unable to meet his own basic needs and is incapable of meeting the needs of his children, particularly because the children all have behavioral problems requiring special attention. Stadler's biggest concern with reunification was the lack of stability for the children while living with Father.

Stadler testified that Father's completion of the Risk to Child Assessment did satisfy the domestic violence evaluation in Task 1(c) of his court-approved case plan. However, she testified that he did not comply with the recommendations of the assessment report, as further required by Task 1(c) of the case plan. Specifically, Father did not complete a cognitive self-change program, or an age-appropriate parenting program for children with behavior disorders. He was enrolled in a parenting program, Love and Logic, at the time of the trial,[2] but failed to provide a certification of completion. Father also did not complete a protective parenting class,

---

[2] This was not the treatment program identified by the Department as the appropriate parenting class, and he did not contact the referral given to him by the Department.

despite having received a referral for the program. Father also failed to complete a 52-week domestic violence treatment program,[3] and failed to complete a psychological evaluation. Father had failed to pursue outpatient treatment for substance abuse by the time of trial.

Regarding Father's task for stable housing, Stadler testified that, upon release, Father lived in a mobile home with four other people and admitted the home was not suitable for children. In December of 2009, Father told Stadler that he would move to a female friend's three-bedroom home but never attended the meeting with Stadler following up on that move. Shortly thereafter, Father told Stadler he had an apartment in Boise but would be moving to a house with more property because he had a dog. It appears from the transcript that Father did find another home in June of 2010, but Stadler was never able to view it due to Father's unavailability. Father moved to yet another home in Meridian, in July of 2010, and continued to live there at the time of the December 2010 trial. Stadler was unable to schedule a viewing of the home until November of 2010, after the State initiated termination proceedings. Stadler identified the home as a three-bedroom double-wide trailer without any furniture. The yard contained a kennel with four pit bulls. Father was living with a woman who had not submitted to a background investigation. The woman is the mother of the person who is alleged to have sexually abused M.V. Stadler determined that Father had partially completed his housing task because he obtained a suitable residence as of July 2010, but was living with an unapproved female, who is linked to M.V.'s sexual abuser.

Regarding Father's employment task, Stadler testified that Father's initial plan was to sell cell phones with a business partner shipping the products from Japan, and that it was unlikely he could produce pay stubs for this income. Father also informed Stadler that he needed to wrap up the termination proceedings in order to move to Virginia where he had an offer to be a producer for his nephew at Def Jam Records for "hundreds of thousands of dollars." Stadler also testified that Father was unwilling to work an eight to ten dollar an hour job "when he could be making hundreds of thousands of dollars." Father did not leave the State for this employment and eventually enrolled in flagging school in June of 2010. However, Father informed Stadler in September that he had been hit by a vehicle and was receiving worker's compensation. Father

---

[3] Stadler testified at trial that, even if Father had enrolled in the treatment program when the recommendation was made, he would not have completed the entirety of the program by the time of the trial, although it would have been nearly finished.

never produced any proof of income and Stadler concluded that Father did not demonstrate that he was able to provide a stable source of income to support the children's needs.

Stadler also testified that Father had not completed the task of his case plan regarding the parenting program required by the Department, nor the protective parenting class. Regarding the fourth task, Stadler testified that Father had not attended any of the children's dental or schooling appointments, nor had he attended any of M.V.'s juvenile corrections matters. Stadler also testified that Father did not complete the amended task in his case plan requiring him to inform the Department of his family contact information. In fact, when another social worker was trying to reach Father to complete this task, Father provided the following response:

> "I've done everything you people want me to do. I've done drug and alcohol testing, got a job making 18.50 an hour, got a home, and will take anger management class. Every time I talk to you people you keep upping the anti with something else. Either give me my kids back or I'm leaving Idaho for Virginia or [I] might need to stay in Idaho, and then I will reunite with them when they are 18. I'm fed up." ["]You people quit playing games or give me my kids back. My kids know the situation. My family will not attend any meeting about taking the kids because they say the kids belong with me. I can't make them attend, so give me my kids back or I am leaving!"

Maggie Olson (Olson) supervised the visitations between Father and the children while they were under the State's control. Olson testified that Father's parenting style generally involved long lectures for minor incidents, and she recommended the Love and Logic parenting books and classes to Father. She testified that Father demonstrated no signs of implementing the parenting techniques taught in the materials for a majority of the visits. However, Olson testified that at a July 2010 visit, Father acknowledged his poor parenting habits, and there was a tearful interaction between him and his children. Thereafter, Olson saw a visible improvement in his parenting habits. Olson also testified that Father missed approximately 12[4] of the 55 supervised visits scheduled with his children, and that he was often late (anywhere from five minutes to an hour late). Further, Olson testified that Father was doing a better job at staying in contact with her during the last few months of the visits. Finally, Olson acknowledged a clear bond between the children and the Father, but identified a lack of trust in his dependability. Father's supervised visits were limited to two hours, and he never requested to extend these visits.

---

[4] It was suggested at trial that three of the absences occurred in May of 2010, and only two absences occurred thereafter. In other words, Father's attendance improved over the course of the proceedings.

At the conclusion of the Department's case, Father sought "summary judgment" dismissing Count IV of the termination petition on grounds that the Department had failed to abide by the time requirements set out in I.C. § 16-1629(9) and dismissing Count V of the petition on the ground that the Department's case was primarily based on Father's failure to complete his case plan tasks. The magistrate court took Father's arguments under advisement. The court entered its Findings of Fact, Conclusions of Law, and Memorandum Decision Re: The Father, Addressing and Disposing of Father's Contentions and Ordering Termination of His Parental Rights. Considering the totality of the evidence, the court determined that Father had neglected his children under I.C. § 16-2002(3)(a) and that termination was in their best interest. Father filed a timely appeal.

## II.

### Issues on Appeal

I.      Did the magistrate court err in declining to apply the time requirements of I.C. § 16-1629?

II.     Did the court err in considering Father's failure to complete his case plan as a basis for its finding of neglect under I.C. § 16-2002(3)(a)?

III.    Is there substantial and competent evidence to support the magistrate court's finding that Father neglected his children?

IV.     Is there substantial and competent evidence to support the magistrate court's finding that termination is in the best interest of the children?

## III.

### Discussion

Parental rights are a fundamental liberty interest, constitutionally protected by the Fourteenth Amendment. *State v. Doe,* 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). In order for the State to intervene and terminate the parent-child relationship, due process requires the State to prove that termination is in the best interest of the child, and that one of the statutorily approved grounds for terminating the relationship are present. *State v. Doe,* 143 Idaho 383, 386, 146 P.3d 649, 652 (2006); I.C. § 16-2005(1). For example, a "court may grant an order terminating the relationship where it finds that termination of parental rights is in the best interests of the child and that . . . [t]he parent has neglected or abused the child." I.C. § 16-2005(1)(a). The Legislature has defined "neglected" in the following manner:

(a) Conduct as defined in section 16-1602(25), Idaho Code; or

(b) The parent(s) has failed to comply with the court's orders in a child protective act case or the case plan, and reunification of the child with his or her parent(s) has not occurred within the time standards set forth in section 16-1629(9),[5] Idaho Code.

I.C. § 16-2002(3) (footnote added). The conduct constituting neglect in I.C. § 16-1602(25) provides that:

"Neglected" means a child:

(a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents . . . or

(b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being . . . .

I.C. § 16-1602(25). In this case, the magistrate court found that Father neglected his children under I.C. § 16-2002(3)(a), and its corresponding definition of conduct constituting neglect in I.C. §§ 16-1602(25)(a) & (b).

## A.  Standard of Review

In order to affirm a magistrate court's order terminating parental rights, there must be clear and convincing evidence to support the court's finding that the statutory grounds for termination exist. *In re Doe* 2009-19, 150 Idaho 201, 203, 245 P.3d 953, 955 (2010).

The trial court must find that grounds for terminating parental rights have been proved by clear and convincing evidence. Whether a matter has been proved by clear and convincing evidence is primarily a matter for the trial court. On appeal, we will not disturb the trial court's findings of fact if they are supported by substantial and competent evidence.

*Id.* (internal citations omitted). "Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Doe*, 143 Idaho at 345-46, 144 P.3d at 599-600 (internal citation omitted).

---

[5] This section contains a rebuttable presumption that the Department shall initiate termination proceedings if "a child is placed in the custody of the department and was also placed in out of the home care for a period not less than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care . . . ." I.C. § 16-1629(9).

**B. The magistrate court did not err in failing to apply the time requirements of I.C. § 16-1629.**

Father argues that the court erred in considering evidence that he failed to comply with his case plan as a basis for neglect under I.C. § 16-2002(3)(b), when the children were not in the Department's custody for the requisite statutory period specified in I.C. § 16-1629(9). His argument focuses on Count IV of the State's petition to terminate Father's rights, which states:

> [Father] has neglected the children. The children are neglected as they are without proper parental care and control, or subsistence, education, medical or other care and control necessary for their well-being because of the conduct or omission of their parents, guardian, or other custodian or their neglect or refusal to provide them, as follows: The father failed to make meaningful and/or timely progress on the tasks of his court-ordered case plan in a Child Protective Act case.

His contention appears to be that the court cannot consider his failure to comply with the case plan without applying the time requirements set out in I.C. § 16-1629(9).

Father's argument on this issue is completely irrelevant to the magistrate court's holdings in this case because the court did not rely on the statutory grounds provided in I.C. § 16-2002(3)(b), which requires a showing of both the statutory timeframe created under I.C. § 16-1629(9) and a failure to comply with the case plan, as well as a finding that termination would be in the best interest of the child. Rather, the court in this case made its determination that termination was appropriate based on its finding of neglect under I.C. § 16-2002(3)(a), and the corresponding definitions of conduct constituting neglect found in I.C. § 16-1602(25)(a) and (b).

> "Neglected" means: (a) conduct as defined in section 16-1602(25), Idaho Code; *or* (b) The parent(s) has failed to comply with the court's orders in a child protective act case or the case plan, and reunification of the child with his or her parent(s) has not occurred within the time standards set forth in section 16-1629(9), Idaho Code.

I.C. § 16-2002(3) (emphasis added). The magistrate court noted that Count IV of the petition "is couched in terms of 16-1602(25)(a), and specifies the neglect to consist in [Father's] failures in accomplishing the tasks of his case plan." Because subsection (a) and subsection (b) are written in the disjunctive, there is no requirement that a magistrate court consider the statutory timeframe in I.C. § 16-1629(9) when it is making a finding of neglect based on subsection (a). Therefore, the timeframe in which the children in this case were in the custody of the State is irrelevant to the magistrate court's decision.

-11-

C. **The magistrate court did not err in considering Father's failure to complete his case plan tasks as a basis for its finding of neglect under I.C. § 16-2002(3)(a).**

Father argues that consideration of his failure to complete the tasks in the case plan cannot serve as evidence of neglect under I.C. § 16-2002(3)(a), but can only be considered to establish neglect under I.C. § 16-2002(3)(b). Father's contention focuses on Count V of the State's petition to terminate Father's parental rights, which reads:

> [Father] has neglected the children. The children are neglected as they are without proper parental care and control, or subsistence, education, medical or other care and control necessary for their well-being because of the conduct or omission of their parents, guardian, or other custodian or their neglect or refusal to provide them, as follows: The father failed to demonstrate the ability to discharge parental responsibilities necessary for the children's health, safety, and/or well-being.

The magistrate court treated Count V of the petition as an allegation of Father's inability to discharge his parenting responsibilities under I.C. § 16-1602(25)(b). Regarding both Count IV of the petition, which relates to neglect under I.C. § 16-1602(25)(a), and Count V of the petition, which pertains to neglect under I.C. § 16-1602(25)(b), the court used Father's failure to comply with the case plan as evidence to support its finding of neglect under I.C. § 16-2002(3)(a).

> The Court concludes that [Father's] failure and refusal to accomplish the tasks of his case plan is 'neglect.' [Father] continues to be unable to discharge his responsibilities to his children, and, as a result, these children lack the parental care necessary for their health, safety and well-being. I.C. § 16-1602(25)(b). Further, because of [Father's] failure and refusal to address the problems which led to the threshold finding of neglect in the CPA case, these children are 'without proper parental care and control or subsistence, education, medical or other care or control necessary for their well-being . . . ." I.C. § 16-1602(25)(a).

Therefore, this Court must address whether a magistrate court is within its discretion to consider a parent's failure to comply with a court ordered case plan as evidence of neglect under I.C. § 16-2002(3)(a), when the Legislature separately addressed this evidence as a basis for neglect under I.C. § 16-2002(3)(b).

It is true that the Legislature specifically identified a parent's failure to comply with a case plan as evidence of neglect in I.C. § 16-2002(3)(b) when it is combined with evidence of a child remaining in the State's custody for the statutory timeframe outlined in I.C. § 16-1629(9). However, the Legislature also provided an alternative means for finding that a parent has neglected his child under I.C. § 16-2002(3)(a), when a court finds that the parent's conduct meets

the broader definitions of conduct constituting neglect under either I.C. § 16-1602(25)(a) or § 16-1602(25)(b). Subsection (a) of I.C. § 16-1602(25) provides that a parent has neglected his child by acts or omissions that leave the child "without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being . . . ." I.C. § 16-1602(25)(a). Subsection (b) provides that a parent has neglected his child when he is "unable to discharge [his] responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being . . . ." I.C. § 16-1602(25)(b). These definitions are certainly broad enough to encompass the consideration of a parent's compliance with a case plan as evidence to support a finding of neglect.

Indeed, this Court has recently affirmed a termination order where a mother's failure to comply with a case plan was used as evidence to support the court's finding of neglect under I.C. § 16-2002(3)(a), and the corresponding definitions of conduct constituting neglect in I.C. §§ 16-1602(25)(a) & (b). *In re Doe* 2009-19, 150 Idaho at 204, 245 P.3d at 956. In that case, the Court noted that the magistrate court's finding of neglect under I.C. § 16-2002(3)(a) "had at its root Mother's lack of progress in overcoming her methamphetamine addiction, which would be related to her compliance with her case plan." *Id.* In fact, the Court later noted that evidence of failure to comply with the case plan as it existed in that case, "was sufficient evidence supporting the trial court's finding that Mother had neglected Child as defined in Section 16-1602(25)(a) & (b)." *Id.* at 206-07, 245 P.3d at 958-59.[6]

Therefore, it is not error for a magistrate court to make a finding of neglect pursuant to I.C. § 16-2002(3)(a), based on noncompliance with a case plan, where such evidence supports a finding of conduct constituting neglect as defined in either I.C. §§ 16-1602(25)(a) or 16-1602(25)(b).[7]

In this case, the magistrate court clearly connected Father's noncompliance with the case plan tasks to its finding of neglect under I.C. §§ 16-1602(25)(a) & 16-1602(25)(b). "The Court finds the evidence to be clear and convincing that the tasks of the case plan required of [Father] were reasonable and clearly connected to the condition that lead to the threshold finding of

---

[6] The case plan in *In re Doe* 2009-19 required Mother to address five areas of concern, four of which had not been met by Mother. *Id.* at 205-06, 245 P.3d at 957-58. The Court identified that sufficient evidence existed to demonstrate noncompliance with all of these tasks, and that such evidence was sufficient to support a finding of neglect under both I.C. §§ 16-1602(25)(a) & 16-1602(25)(b).

[7] *See also State, Dep't of Health & Welfare v. Doe*, 145 Idaho 662, 665, 182 P.3d 1196, 1199 (2008) (affirming a finding of neglect under I.C. § 16-1602(25)(a) on evidence directly related to unaccomplished case plan tasks).

neglect. The effects of the neglect upon the children were deep seated and long term, and . . . have led to serious emotion[al], medical and educational deficits [for the children]." There was no error in the court's consideration of Father's failure to comply with case plan compliance in order to support its finding of neglect under I.C. § 16-2002(3)(a) because the court tied the case plan tasks to the definitions of conduct constituting neglect under I.C. §§ 16-1602(25)(a) & (b). The sufficiency of these findings is discussed in the following section.

### D. There is substantial and competent evidence to support the magistrate court's finding that Father neglected his children.

Father argues that the magistrate court's finding of neglect is not supported by substantial and competent evidence because he was making progress on his case plan, particularly in the area of finding shelter and employment, enrolling in a domestic violence treatment program, and in improving his parenting skills. However, we find that there is substantial and competent evidence supporting the magistrate court's finding that Father engaged in conduct constituting neglect as defined by I.C. §§ 16-1602(25)(a) & (b).

Father has neglected his children by failing to provide them with proper parental care and control under I.C. §§ 16-1602(25)(a)[8] in numerous ways. The most apparent fact supporting this finding is Father's commission of an act of domestic violence in the presence of his children. Although Father acknowledged his violent outbursts, particularly while under the influence of alcohol, he did not enroll in a domestic violence treatment program until threatened with a violation of his probation in November of 2010. There is also evidence that he minimizes his dependency on alcohol and expresses a lack of interest in the treatment recommended by his social workers. Furthermore, Father continually exposed the children to chaotic living environments and may be making a similar decision by currently living with an ex-girlfriend who is also the mother of M.V.'s alleged sexual abuser. Additionally, the children never obtained medical or dental care while living with Father, despite the obvious need for such care. Additionally, Father essentially treated M.V. as the mother responsible for caring for D.B. and A.B., despite her own youth. Further, all the children are at least one year behind in school as a result of Father's sporadic moves, which further demonstrates the lack of parental care and control offered by Father to ensure the well-being of the children.

---

[8] Again, subsection (a) of I.C. § 16-1602(25) provides that a parent has neglected his or her child by acts or omissions that leave the child "without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being . . . ." I.C. § 16-1602(25)(a).

There is also substantial and competent evidence of neglect under I.C. § 16-1602(25)(b).[9] While incarcerated, Father was unable to act as a parent to the children, and it was during this time that they were first thrust into the foster care system, yet Father still fails to take any personal responsibility for their situation. Although Father has made efforts to obtain work, there is no indication that he has maintained a steady source of legitimate income, and the evidence indicates that Father primarily relies on get-rich-quick schemes, rather than taking offers of employment offering less pay. Father's failure to complete a substance abuse treatment program also demonstrates his inability to care for the children because alcohol was often the source of his violent outbursts, and the reason for the family's frequent moves. In *In re Doe*, this Court affirmed a magistrate court's finding of neglect based on the type of conduct identified in I.C. § 16-1602(25)(b), where the parent failed to "demonstrate consistency in housing, employment, and/or abstinence from controlled substances, impairing his ability to provide proper care for the child." 149 Idaho at 407, 234 P.3d at 731. In this case, Father has similarly failed to demonstrate consistent housing or employment and has not demonstrated an ability to create the stable living environment that his children need.

Father overlooks the fact that the magistrate court found in the Child Protective Act proceedings that he had neglected the children. The case plan was subsequently adopted in order to give the Father a chance to remedy his past neglectful practices. He simply failed to make the effort to do what was required of him in order to properly care for his children. Although he has completed several of the required evaluations, he has not demonstrated a commitment to completing parenting classes for children with behavior disorders, or to completing substance abuse treatment classes. Father has also failed to demonstrate an ability to provide stable income and employment to provide for his family.

Furthermore, Father's progress under the case plan was not made until after the initiation of termination proceeding or when threatened with probation violations. This Court recently affirmed a finding of neglect pursuant to I.C. §§ 16-1602(25)(a) & (b) where a mother failed to demonstrate signs of improvement, and, or, compliance with her case plan until *after* the Department initiated the termination proceedings.

---

[9] Subsection (b) provides that a parent has neglected their child when he or she is "unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being . . . ." I.C. § 16-1602(25)(b).

> Unfortunately, Mother did not take this matter seriously until about the time the court instructed Department to proceed with termination. The court found, "Since March, 2009, she has greatly improved showing signs of compliance with her drug court requirements." However, the court concluded, "She should be given credit for her progress, but it is not in the best interest of her Child to wait for permanency.... [S]he has a long and stubborn addiction to methamphetamines and she is only very early in her recovery."

*In re Doe* 2009-19, 150 Idaho at 207, 245 P.3d at 959. *See also State, Dep't of Health & Welfare v. Doe*, 145 Idaho 662, 664-65, 182 P.3d 1196, 1198-99 (2008) (finding substantial and competent evidence to support magistrate court's finding of non-compliance with Mother's case plan, except in matters required for her probation).

In this case, there is evidence that Father made progress on the case plan tasks to which he was assigned because he obtained housing, enrolled in a domestic violence treatment program, and potentially obtained employment. However, like in *In re Doe* 2009-19, Father largely failed to make progress on his case plan during the first ten months of its operation, and only entered a domestic violence treatment program after being threatened with a violation of his probation. "The only program in which he enrolled which met the case plan's requirements was the domestic violence program which he began only after the Department filed the petition herein to terminate his parental rights on November 17, 2010, and only after his probation officer had run out of patience with him . . . ."

In sum, although there is evidence that Father has recently made improvements in meeting the demands of the Department in order to reunite with his children, there is also substantial and competent evidence supporting the magistrate court's finding that he has neglected his children as defined by I.C. §§ 16-1602(25)(a) & (b). Furthermore, this Court is not in a position to reweigh the evidence and "defer[s] to the trial court's unique ability to accurately weigh the evidence and judge the demeanor of the witnesses and take into account the trial court's superior view of the entire situation. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007) (internal quotation omitted). Therefore, there is substantial and competent evidence to support the magistrate court's finding of neglect pursuant to I.C. § 16-2002(3)(a).

**E. There is substantial and competent evidence to support the magistrate court's finding that termination is in the best interest of the children.**

Father argues that termination is not in the best interest of the children because Father and the children are bonded, and because the children desire to be reunited with Father. Additionally, Father argues that termination is not in their best interest because they have not been adjusting well to foster care, and there was never any violence between Father and his children.

It is true that the children have demonstrated some negative tendencies after entering foster care. M.V. has developed a juvenile record, and D.B. has had two serious instances of acting out in school. The children's psychologist also identified that the behavior disorders of D.B. and A.B. are likely induced by the added stress of entering the foster care system and enduring the termination proceedings. Father produced one witness that testified to the childrens' success in school while under the Father's care, as well as to their normal behavioral tendencies prior to entering foster care. Perhaps of more importance is the fact that all of the children have recognized a bond with Father, and have expressed a desire to reunite with him. There was no testimony that Father abused the children. Indeed, one witness, in whose home Father and the children resided after first coming to Idaho, testified that the children did well in school while under Father's control, that he contributed financially to their subsistence, and that the kids did not exhibit any extreme behaviors while under his control.

However, there is also evidence that the children exhibited violent tendencies prior to entering foster care, and that termination is in their best interest. When visiting their mother in Virginia, the children were reportedly violent and disruptive, putting holes in her walls and acting out. Father has committed assaults in front of his children, and M.V. has demonstrated similar violent tendencies. Father has an admitted dependency on alcohol, which he continues to minimize, and continues to blame his anger management issues on others. Additionally, Father subjected the children to frequent moves, which likely led to their being at least one year behind in school and never addressed their medical or dental needs. Father has not demonstrated an ability to maintain and obtain a legitimate source of income while the children have been in the State's custody. While he has obtained housing for them, his decision to live with the mother of M.V.'s alleged sexual abuser is cause for serious concern regarding Father's judgment and ability to protect his children and provide them with a safe living environment.

-17-

While this is not one of the worst cases of neglect this Court has reviewed, the Court is limited in its standard of review, which requires that we view the evidence in light of the magistrate court's findings and refrain from re-weighing the evidence on appeal. There is substantial and competent evidence supporting the magistrate court's finding that termination is in the children's best interest because these children need stability in their lives and Father has not demonstrated that he is able or willing to provide that stability. The family's case worker, Julie Stadler, made such a recommendation during the termination hearing and stated that Father has yet to demonstrate an ability to care for his own needs, let alone the growing needs of his children. Stadler's testimony is particularly important because she observed and worked with Father and the children over the entirety of the proceedings. Additionally, the children's guardian ad litem testified that, even if the children were not able to find adoptive families, foster care would be preferable because "there is some structure and consistency and predictability that their lives would have that they wouldn't have if they were with their father." Finally, Cafferty, who conducted the Risk to Child Assessment, testified that Father is at a high risk for continued mistreatment and neglect of his children. The testimony of these individuals supports the additional evidence in the record demonstrating Father's lack of commitment to create the environment necessary to reunite with his children. So long as he treats the Department's protective measures as games and fails to take responsibility for the situation in which he is in, it is unlikely that these children will live with any kind of stability while under his care. The magistrate court carefully weighed the bond between Father and the children, but found the childrens' need for stability, in combination with Father's lack of meaningful progress on his case plan, demonstrated that termination of his parental rights was in the children's best interest. This finding is supported by substantial and competent evidence.

### III.

### Conclusion

We affirm the judgment of the magistrate court terminating the parental rights of Father to his three minor children.


Chief Justice EISMANN, and Justices BURDICK, W. JONES and Justice Pro Tem TROUT CONCUR.

-18-