# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 45485

|  |  |  |
|---|---|---|
| In the Interest of:  JANE DOE I, <br> A Child Under Eighteen (18) Years of Age. <br> ---------------------------------------------------------- <br> **IDAHO DEPARTMENT OF HEALTH AND WELFARE,** <br><br>     Petitioner-Respondent, <br><br> v. <br><br> **JANE DOE (2017-36),** <br><br>     Respondent-Appellant, <br><br> and <br><br> **GUARDIAN AD LITEM,** <br><br>     Intervenor-Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Boise, February 2018 Term** <br><br> **2018 Opinion No. 12** <br><br> **Filed:  February 9, 2018** <br><br> **Karel A. Lehrman, Clerk** |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County.  Hon. Andrew Ellis, Magistrate Judge.

Magistrate court order terminating parental rights, <u>affirmed.</u>

Ada County Public Defender's Office, Boise, for appellant.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent.

Eberle, Berlin, Kading, Turnbow & McKlveen Chtd., Boise, for intervenor-respondent.

---

## ON THE BRIEFS

BURDICK, Chief Justice.

Jane Doe (Mother) appeals the Ada County magistrate court's termination of her parental rights to her minor child, A.L. (Child). The Idaho Department of Health and Welfare (IDHW) filed a petition to terminate Mother's parental rights to Child on August 26, 2016, and an

amended petition on June 30, 2017. After a two-day trial, the magistrate court found termination proper on several bases of neglect and entered an order to that effect. Mother timely appeals, and for the reasons that follow, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Child was removed from Mother's custody and placed into foster care on June 25, 2015, after Mother's roommate reported to law enforcement that Mother had attempted to commit suicide in front of Child, who was then five years of age. Mother's suicide attempt stemmed from frustration with Child because Child refused to sleep. Mother thus "smacked [Child] in the mouth" and then yelled, "I'm going to kill myself, I can't take it anymore" before taking three Ambien sleeping pills in front of Child. Mother was admitted to the hospital for psychiatric care.

Mother has suffered traumatic experiences and mental health problems since her childhood. For example, Mother's brother sexually and physically abused her when she was a child. After a suicide attempt in 2002, she was diagnosed with major depressive disorder and began receiving treatment for mental health problems. Since 2002, Mother has experienced considerable mental health fluctuations, resulting in frequent "ups and downs." These fluctuations caused several periods of hospitalization.

Before Child's birth in 2009, Mother met and married John Doe (Father).[1] Father, a registered sex offender, had parole conditions that largely barred contact with Child after Child's birth. As such, Mother primarily raised Child alone during the first few months of Child's life. Later, when Father was around, he noticed that Mother's focus was on watching television, not Child. According to Father, Mother and Child never had a positive relationship.

Mother emotionally abused Child. For example, Mother told Child, "I hate you. I don't want you anymore. I wish you hadn't been born." Mother explained that she "yelled at [Child] a lot." Mother recognized that this abuse "affected [Child] a lot." At times Mother's abuse turned physical. Mother reported to IDHW that she "often times will 'pop [Child] in the mouth' or give her a 'swat on the butt' with her hand if [Child] refuses to listen to her." Mother explained that Child was a "trigger" for her anger and mental health issues.

Emotional and physical abuse also plagued Mother and Father's relationship, with Child witnessing it at times. During the first few years of their marriage, Mother would "pop off at the

---

[1] Father's parental rights were terminated concurrently with Mother's. Mother's appeal pertains only to the termination of her parental rights.

snap of a button . . . . [Mother] would yell at [Father]. [Mother] would curse. [Mother] would put [him] down." Father became physically abusive towards Mother after he "reach[ed his] boiling point" and grabbed Mother to restrain her and "los[t] his control" at some point in 2013. Father did not recall ever physically striking Mother, but he "grabbed her to the point where -- sometimes to restrain her, and at some times where [Father] just lost control, and [Father] felt like [he] was going to do something that was going to end up putting [him] back in prison." Child witnessed some of the incidences, including some that became physically abusive, which Father attributed to Mother.

IDHW learned the full extent of Child's treatment after Child was placed into foster care. Specifically, after Mother was released from hospitalization following her suicide attempt, she informed an IDHW safety assessor that (1) Child was "trigger" and Mother "could go off at any moment"; (2) Mother was not in control of her mental health and was thus "worried about her ability to take care of [Child]"; and (3) Mother would "pop one off on [Child] in [Child's] mouth when she needed it." IDHW thus grew concerned over Mother's ability to parent Child, which concern was exacerbated when Mother expressed her wish that Child be placed with her maternal grandmother, notwithstanding that Mother's brother, who had sexually assaulted Mother when she was approximately the same age as Child was, resided in Mother's maternal grandmother's house. In light of these concerns, a case plan was entered on August 13, 2015.

Child initially exhibited bad behavior and poor decision making while in foster care. For example, Child would throw "extreme fits" ten or twenty times per day and was expelled from preschool for exhibiting aggression toward other students and pulling fire alarms. When Mother was confronted about these issues, she did not express any concern, much less advice on how to resolve them, which IDHW's social worker testified was "a rare thing to see . . . ." After approximately two months in foster care, Child began counseling and was diagnosed with general anxiety disorder, post-traumatic stress disorder, and parental-relational issues. In counseling, Child reported "very specific nightmares about [Mother]." The nightmare "always involved a weapon and her mother and [Child] being the victim. And there was always blood, and it was quite graphic." The counselor concluded there was "a significant issue between [M]other and [C]hild."

Child was placed into a second foster home in August 2016. Child's former foster parents explained that Child's "extreme behaviors and particularly the screaming fits and the screaming

and physical fits" took a significant toll on them, though Child did improve gradually while in their care. Nevertheless, Child improved greatly with more time in foster care under the care of her second foster family. By the 2016–17 schoolyear, Child was (1) "on grade level" and even exceeded some expectations in some areas; (2) able to develop and maintain friendships; (3) "show[ed] empathy towards her peers"; and (4) able to "start[] to trust adults more, a lot more." When Child's former foster parents saw Child in August 2017, approximately one year after Child had left their care, they felt that Child "was a different kid" and Child's progression had continued "in an amplified way." Overall, Child has become "just a happy kid," but once Mother is mentioned, Child has "meltdowns that c[an] last anywhere from 45 minutes to three hours."

IDHW thus filed a petition to terminate Mother's parental rights on August 26, 2016. Shortly thereafter, in September 2016, IDHW moved to suspend Mother's visitation rights, explaining that Child's "visits with [Mother] are hindering progress in therapy and life." Mother, who had missed twenty-eight visits since January 2016, agreed that discontinuing visits "would be better for both [her] and [Child,]" and acknowledged that she was unable to care for Child "based on [Mother's] state of mental health." Accordingly, the magistrate court entered an order on October 13, 2016, limiting visitation with Mother to that which Child requested and requiring it to take place in a therapeutic setting.

IDHW amended its termination petition on June 30, 2017. After a two-day trial, on October 16, 2017, the magistrate court entered an order terminating Mother's parental rights, finding that Mother had neglected Child and, further, that termination was in Child's best interests. Mother timely appeals, and, after the parties' consented, this Court entered an order on December 15, 2017, placing this matter for submission on the briefs.

## II. ISSUES ON APPEAL

1. Whether the magistrate court's finding that Mother neglected Child is supported by substantial, competent evidence.

2. Whether the magistrate court's finding that termination was in Child's best interests is supported by substantial, competent evidence.

## III. STANDARD OF REVIEW

Under "Idaho Code section 16-2005(1), a court may terminate parental rights if it finds that doing so is in the best interests of the child and that at least one of five grounds for termination is satisfied." *In re Doe (2014-23)*, 157 Idaho 920, 923, 342 P.3d 632, 635 (2015). "The grounds for terminating a parent-child relationship must be proved by clear and convincing

evidence." *In re Doe (2013-15)*, 156 Idaho 103, 105–06, 320 P.3d 1262, 1264–65 (2014); *see also* I.C. § 16-2009. "Clear and convincing evidence is evidence that indicates the thing to be proved is highly probable or reasonably certain." *In re Doe (2014-17)*, 157 Idaho 694, 699, 339 P.3d 755, 760 (2014). This Court must conduct an independent review of the record, "but must draw all reasonable inferences in favor of the magistrate court's judgment, as the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties." *In re Doe (2014-23)*, 157 Idaho at 923, 342 P.3d at 635 (quoting *Doe I v. Doe II*, 150 Idaho 46, 49, 244 P.3d 190, 193 (2010)). "[T]his Court will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision." *Doe I*, 150 Idaho at 49, 244 P.3d at 193. "Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation and quotation marks omitted). Even if conflicting evidence is in the record, the judgment must be upheld so long as it is supported by substantial, competent evidence. *Doe I v. Doe*, 138 Idaho 893, 905–06, 71 P.3d 1040, 1052–53 (2003) (citation omitted).

## IV. ANALYSIS

Termination of the parent-child relationship requires a two-prong finding that (A) at least one of the five bases for termination is satisfied, and (B) termination is in the best interests of the child. *In re Doe (2014-23)*, 157 Idaho at 923, 342 P.3d at 635 (citing I.C. § 16-2005(1)). Each prong is discussed below.

### A.     We affirm the magistrate court's finding of neglect.

The magistrate court found that Mother neglected Child. Idaho Code defines several bases of neglect. One arises where:

> The parent(s) has failed to comply with the court's orders or the case plan in a child protective act case and:
>
>> (i) The department has had temporary or legal custody of the child for fifteen (15) of the most recent twenty-two (22) months; and
>>
>> (ii) Reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the department.

I.C. § 16-2002(3)(b).

> Other bases of neglect include a child:

>> (a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or

omission of his parents, guardian or other custodian or their neglect or refusal to provide them; however, no child whose parent or guardian chooses for such child treatment by prayers through spiritual means alone in lieu of medical treatment shall be deemed for that reason alone to be neglected or lack parental care necessary for his health and well-being, but this subsection shall not prevent the court from acting pursuant to section 16-1627, Idaho Code; or

(b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being; or

I.C. § 16-1602(31).

Here, the magistrate court found the following three bases of neglect:

[Mother] has neglected [Child]. The parent has failed to comply with the Court's orders or the case plan in a Child Protective Act case; and, the Department has had temporary or legal custody of the child for fifteen (15) of the most recent twenty-two (22) months; and, reunification has not been accomplished by the last of the fifteenth month in which the child has been in the temporary or legal custody of the Department.

. . . .

[Mother] neglected [Child]. [Child] is neglected as she is without proper parental care and control, or subsistence, education, medical or other care and control necessary for her well-being because of the conduct or omission of their parents, guardian or other custodian or their neglect or refusal to provide them, as follows: [Mother] subjected [Child] to and/or failed to protect [Child] from experiencing significantly traumatic abusive or neglectful events or parenting during childhood; and as a result, [Child] has an insecure attachment to [Mother] such that contact causes a stress response and/or hinders her progress in therapy and life.

. . . .

[Mother], neglected [Child]. [Child] is neglected as she is without proper parental care and control, or subsistence, education, medical or other care and control necessary for her well-being because of the conduct or omission of their parents, guardian or other custodian or their neglect or refusal to provide them, as follows: [Mother] failed to effectively learn and/or implement proper parenting and/or communication skills during therapeutic opportunities with [Child] that would have demonstrated an ability to appropriately address [Child's] trauma and/or to implement effective behavior interventions and/or to repair [Child's] insecure attachment.

On appeal, Mother's single attack is against the magistrate court's finding that she failed to comply with her case plan. Mother thus fails to challenge the magistrate court's findings of additional bases of neglect. For that reason, this Court need not reach Mother's argument because, even if she is correct, the magistrate court's order contains additional, unchallenged findings of neglect that must be affirmed. *E.g.*, *Schweitzer Basin Water Co. v. Schweitzer Fire*

6

*Dist.*, slip op. 44249, at p. 10 n.4 (Idaho Nov. 28, 2017) ("Where a lower court makes a ruling based on two alternative grounds and only one of those grounds is challenged on appeal, the appellate court must affirm on the uncontested basis." (quoting *Ballard v. Kerr*, 160 Idaho 674, 699, 378 P.3d 464, 489 (2016)); *accord In re Doe*, 123 Idaho 502, 504, 849 P.2d 963, 965 (Ct. App. 1993).

**B.    We affirm the magistrate court's finding that termination is in the best interests of Child.**

As noted, even if neglect is found, termination is proper only if it is in the best interests of the child. I.C. § 16-2005(1). When considering a child's best interests, numerous factors may be considered. *E.g.*, *Doe v. Doe I (2017-15)*, 162 Idaho 653, ___, 402 P.3d 1106, 1113 (2017). Among those factors are the "stability and permanency" of the home, as well as "the 'parent's history with substance abuse, whether the parent has provided financial support, the child's relationship with those currently caring for him or her and whether the child has improved under that care, [and] the child's need for stability and certainty . . . .' " *Id.* (quoting *In re Doe (2015-03)*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015)). Naturally included within the best interests analysis is the parent's "ability to care for [the child]." *Id.*

Here, the magistrate court's finding that termination was in Child's best interests is supported by substantial, competent evidence. For starters, as of the time of trial, Mother was unable to provide a stable and permanent home for Child. In fact, Mother testified that she was living in a place where Child could not reside. Mother was living in a home with eight roommates, one of whom was a registered sex offender who had been convicted of a "crime against a child under the age of 16." Mother was similarly unable to provide a stable and permanent home for Child when Child was placed into foster care after Mother was released from the hospital following her suicide attempt, as Mother was being evicted from her current housing. Mother's persistent inability to provide a stable, permanent place for Child to reside conforms to her prior statements that she did not want Child anymore, and that discontinuing visits "would be better for both [Mother] and [Child]." *Cf. In re Doe (2011-13)*, 151 Idaho 846, 851, 264 P.3d 953, 958 (2011) (affirming the magistrate court's best interests ruling in favor of termination, noting that "the court relied on considerable testimony that the children needed stability, which Mother admitted, by her own verbal and non-verbal actions before and during trial, she could not provide").

While there is evidence that Mother has provided financial support to Child since obtaining a full-time job in October 2016, there is also evidence that Mother failed to verify her full-time employment with IDHW, as required by the case plan. Moreover, there is ample evidence that Child has improved under foster care. At first in foster care, Child would throw "extreme fits" ten or twenty times per day and was expelled from preschool after exhibiting aggression toward other students and pulling fire alarms. She was required to repeat kindergarten due to her behavior. Child's outbursts were less frequent during periods when Child did not have contact with Mother. For example, during a no-visitation period from January 2016 to February 2016, Child's outbursts occurred only two to five times per day, lasting ten to fifteen minutes. But once visits resumed, the high-intensity and high-frequency outbursts returned.

However, Child steadily improved with more time in foster care. By the 2016–17 schoolyear, Child was (1) "on grade level" and even exceeded some expectations in some areas; (2) able to develop and maintain friendships; (3) "show[ing] empathy towards her peers," and (4) able to "start to trust adults more, a lot more." When Child's former foster parents saw Child in August 2017, approximately one year after Child had left their care, they felt that Child "was a different kid" and Child's progression had continued "in an amplified way." Overall, Child has become "just a happy kid," but once Mother is mentioned, Child has "meltdowns that c[an] last anywhere from 45 minutes to three hours." There is also ample evidence that Child has developed a positive relationship with her foster family, as Child's counselor testified that Child has expressed hope to remain with Child's current foster family, and that Child "stresses because [Child] doesn't want to move. And [Child] makes that very clear, and in several sessions." *Cf. In re Doe (2017-4)*, 162 Idaho 266, ___ 396 P.3d 695, 700 (2017) (affirming magistrate court's best interests finding in favor of termination, noting that the child had "stated his preference to continue to live with his foster parents").

Child's continued development requires stability and certainty. Child's counselor testified at trial that termination was in Child's best interests, as Child "is functioning at an incredible level of -- based on [Child's] age. I mean, [Child is] in a regular classroom now. [Child is] functioning well at daycare. [Child is] doing amazingly well in therapy." As noted, Child's counselor further testified that Child has expressed hope to remain with Child's current foster family and stresses that Child does not want to move. Child's counselor feared that Child would face "a significant regression" if Mother were in Child's life, based on Child's "trauma that

8

[Child] has processed through, and based on that [Child] never asks about either one of [Child's] parents." As a result, the magistrate court acknowledged that Child "needs a caregiver that has patience, can set boundaries and regular routines, maintain a consistent schedule and lifestyle, and provide [Child] with unconditional love. [Mother] cannot provide that stability, certainty, patience, boundaries, and consistent home environment." *Cf. In re Doe (2013-29)*, 156 Idaho 682, 689, 330 P.3d 1040, 1047 (2014) (finding that the magistrate court was correct to recognize that the child needed "to develop physically, mentally, and emotionally"); *In re Doe (2011-02)*, 151 Idaho 356, 368, 256 P.3d 764, 776 (2011) ("[T]hese children need stability in their lives and Father has not demonstrated that he is able or willing to provide that stability."); *Roe v. Doe*, 142 Idaho 174, 179, 125 P.3d 530, 535 (2005) ("There was evidence that Baby Doe is afraid of [Father's] anger and that the child desires to remain with the [foster parents]. There is substantial and competent evidence to support the trial court's finding that termination is in the best interests of Baby Doe.").

Moreover, Mother has demonstrated a consistent inability to care for Child. Mother subjected Child to a home environment plagued by physical and emotional abuse. As between Mother and Father, Child witnessed incidences of abuse, including two that became physically abusive, which Father attributed to Mother. And as between Mother and Child, Mother told Child, "I hate you. I don't want you anymore. I wish you hadn't been born." Mother "yelled at [Child] a lot." Mother recognized that this abuse "affected [Child] a lot." At times Mother's abuse turned physical. Mother reported to IDHW that she "often times will 'pop [Child] in the mouth' or give her a 'swat on the butt' with her hand if [Child] refuses to listen to her." Mother explained that Child was a "trigger" for her anger and mental health issues.

In addition to emotional and physical abuse, Mother has a demonstrated history of mental health problems that have interfered with her ability to care for Child. Mother even "acknowledged not being able to care for her child based on her state of mental health." As a result of these mental health problems, Mother has mental health fluctuations, resulting in frequent "ups and downs." These fluctuations have caused several periods of hospitalization. Further, Mother attempted to commit suicide in front of Child immediately before Child was taken into foster care. The magistrate court thus found that Mother's "on-going and intractable mental health concerns will make her a perpetual risk of violence and emotional abuse to any child in her care."

9

Mother rebuts that she has made progress with her mental health problems. As she testified at trial, during the year preceding trial, she had

> attended counseling. I have seen a med manager at Terry Reilly for my prescriptions. They have been changed off and on because some of them haven't worked. They haven't -- they didn't work anymore. I have been taking the same medications that I'm on right now for a year. And they seem to do the -- to work.

Mother's counselor corroborated this testimony, stating that "[t]o my knowledge, [Mother] has had consistent employment for over six months at this point. She has maintained the same residence for several months, and has made all appointments with her medical provider to address any medication management concerns."

Even so, Mother's recent, modest improvements were insufficient to overcome her history of demonstrated unfitness. In fact, Mother's counselor was unable to connect Mother's improvements to her parental ability:

> Q. Do you think that [Mother] is stable enough, at this point in her life, that she could be a parent?
> A. I have never seen [Mother] in a parenting capacity. So, in that, I could not say.

By contrast, an IDHW client service technician, who had witnessed Mother's contact with Child, testified to continuing concerns over Mother's ability to parent Child. The specific testimony was, *inter alia* that (1) Mother does not understand "how to connect with [Child] and give [Child] the kind of nurturing and love and attention [Child] needs"; and (2) despite any recent progress asserted by Mother, Mother's mental health remained a real and current concern because it would fluctuate from "very sweet and very engaging" to "very angry." Similarly, Child's counselor testified that termination was in Child's best interests, as did an IDHW social worker.

Based on the evidence presented, the magistrate court correctly recognized,

> [i]t is only now - after nearly a year with no face-to-face contact between [Child] and [Mother] -- that [Child] has been able to stabilize. [Child's] foster mother, counselor and case worker are united in their opinion that resuming contact between [Child] and [Mother] would cause [Child] to regress to her previous dysfunctional state.

Accordingly, we conclude the magistrate court's finding that termination is in Child's best interests is supported by substantial, competent evidence.

10

## V. CONCLUSION

Because substantial, competent evidence supports the magistrate's order, the termination of Mother's parental rights is affirmed.

Justices BRODY and BEVAN, **CONCUR**