IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 46482

In the Matter of: Jane Doe and John Doe I,
Children Under Eighteen (18) Years of Age.
--------------------------------------------------------

IDAHO DEPARTMENT OF HEALTH
AND WELFARE,
  Petitioner-Respondent,

v.

JOHN DOE,

  Respondent-Appellant,

and

GUARDIAN AD LITEM,

  Intervenor-Respondent.

Boise, February 2019 Term

Opinion Filed: March 14, 2019

Karel A. Lehrman, Clerk

Appeal from the Magistrate Court of the Fifth Judicial District, State of Idaho, Lincoln County. Hon. Daniel Dolan, Magistrate Judge.

Decree terminating parental rights, affirmed.

Brown Law Office, PLLC, Gooding, for appellant.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent.

_____

BURDICK, Chief Justice.

John Doe ("Father") appeals from a Lincoln County magistrate court's judgment terminating his parental rights to his minor children. The judgment also terminated the parental rights of the children's mother ("Mother"). She appeals in a separate action.

The children were placed in the custody of the Department of Health and Welfare (the "Department") following a March 2016 petition under the Child Protection Act ("CPA"). In June

1

2016, the court ordered the parents to follow case plans provided by the Department. Eight months later, the State filed a motion to terminate the parental rights of both parents based on failure to comply with the case plan and on prior neglect. After holding a trial, the court terminated both parents' parental rights.

Father timely appeals arguing that the magistrate court's finding of neglect is not supported by substantial, competent evidence and that the court erred by not considering how Father's periods of incarceration affected his ability to comply with the case plan. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal concerns the termination of Father's parental rights to his two minor children. Father and Mother are the biological parents of the minor children. Prior to the termination, the children and parents were the subject of a CPA proceeding for over two years. When the prosecutors first filed a petition under the CPA, the parents were listed with separate addresses, but were living together. However, the parents ended and rekindled their relationship at various times prior to and during the CPA proceeding. By the time of trial, Father and Mother were permanently separated.

The Department became involved in early March 2016 after receiving reports of drug use and neglect involving the children. Prior to this, the Department had received referrals for the family on two occasions in 2013 and 2014. The Department's investigation revealed that both children had been born premature, exposed to drugs in-utero, and tested positive for methamphetamine at birth. Based on these concerns, the Lincoln County Prosecutor's Office filed a petition under the CPA in March 2016.

In April 2016, the Lincoln County magistrate court opened a CPA proceeding and placed the children in the legal custody of the Department. However, the court ordered the children to remain with the parents for the time being. A week later, the Department and a Lincoln County law-enforcement officer conducted an unannounced home visit. The officer declared that the children were in imminent danger based on the condition of the home and Mother's statements about the parents' drug use and domestic disputes around the children. The officer removed the children from the parents' custody and placed them in foster care. At the subsequent shelter-care hearing, the court ordered the children to remain in the Department's custody. At the adjudicatory hearing in May 2016, both parents stipulated to an unstable home environment as the basis for the CPA proceedings and the children remained in the Department's custody.

About a month later, Father agreed to participate in and accomplish a case plan provided by the Department. The case plan contained 14 tasks for Father to complete which would demonstrate his "ability to obtain and maintain sobriety" and provide the children with "a safe and drug-free home environment." The tasks were aimed at addressing "all original areas of concern that brought the family to the attention of the Department" and ensuring "the children will have a safe, stable, sanitary and drug-free home environment." Paraphrased, some of the tasks were: coordinating with the Department to complete a GAIN assessment; completing the GAIN assessment and abiding by the resulting recommendations; participating in drug testing; providing for the children financially; obtaining and maintaining safe and satisfactory housing for the children; allowing the Department to conduct unscheduled home visits; coordinating with the Department and housing-assistance services; caring for the children's health and educational needs; and completing a parenting class and demonstrating the ability to apply those skills. The Department placed a social worker, D.W., on the CPA case to assist and monitor the parents' progress.

Beginning in March 2017, almost a year after the children were first placed in the Department's custody, a few events took place. First, the court held a permanency hearing in late March 2017. The court extended the disposition of the permanency hearing for 30 days to allow the parents time to show improvement. Second, K.S., the owner of a private company which contracts with the Department to provide services, began coordinating supervised visitations between Father and the children. Third, in early April 2017, a few days after the court extended the permanency hearing, the Department moved to terminate parental rights. The original 30-day extension was lengthened to almost 90 days after the permanency review hearing was moved to June 2017. Lastly, in May 2017, a new social worker, E.D., took over for D.W. on the case.

It is difficult to establish a concrete timeline for Father's activities during the year following the children's placement with the Department, but a few things can be gleaned from the record. In that year, Father missed various scheduled drug tests, tested positive for methamphetamine and benzodiazepine in others, and tested clean a small amount of the time. He was employed for a few months in Pocatello. The only proof of stable housing he provided to the Department was a motel in Gooding where he stayed for a brief period, but he also lived with his mother, and in a tent. He was incarcerated at various intervals for an estimated total of three months because of probation violations stemming from misdemeanor crimes. In May 2017,

Father reported that he attended parenting classes, but when D.W. followed up on his report, the clinic had no record of his attendance. After rescheduling and postponing appointments during the year, Father participated in a mental-health assessment for the first time in May 2017 but did not continue with treatment following the assessment. He attended some supervised visits with the children, but missed more than half of those scheduled.

In June 2017, the court accepted the Department's recommendation for adoption as the permanent placement plan. The court directed the parties to begin preparing for trial. However, the trial was delayed until October because of Father's lack of communication with his attorney. The October trial date was then continued because there was no proof that the parents had been served process at the time it was scheduled to begin.

Commencing in January 2018, the termination trial was split over three days in January and March. Father testified, as well as D.W., E.D., K.S., the children's foster parent, Mother's parents, and Mother's physician. The parties submitted written closing arguments in July 2018 and the court issued its memorandum decision and a final judgment in October 2018. The court terminated both parents' parental rights. The court found, by clear and convincing evidence, that Father neglected his minor children by failing to complete his case plan and termination was in the children's best interests. Father timely appeals.

## II. ISSUES ON APPEAL

1. Does substantial, competent evidence support the magistrate court's finding that Father neglected the minor children by failing to comply with his case plan under Idaho Code section 16-2002(3)(b)?

2. Did the magistrate court properly consider Father's periods of incarceration when it determined that Father neglected the children by failing to comply with his case plan?

## III. STANDARD OF REVIEW

Under Idaho Code section 16-2005(1), a court may terminate parental rights if it finds that at least one of the grounds for termination is present and termination is in the best interest of the child. *In re Doe (2014–23)*, 157 Idaho 920, 923, 342 P.3d 632, 635 (2015). The grounds for termination of parental rights must be proved by clear and convincing evidence. *Idaho Dep't of Health & Welfare v. Doe (2016-14)*, 161 Idaho 596, 598, 389 P.3d 141, 143 (2016). Clear and convincing evidence is "evidence indicating that the thing to be proved is highly probable or reasonably certain." *Doe I v. Doe II*, 150 Idaho 46, 49, 244 P.3d 190, 193 (2010) (quoting *In re Adoption of Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006)).

However, on appeal, "this Court will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision." *Doe I.*, 150 Idaho at  49, 244 P.3d at 193 (citing *State v. Doe*, 143 Idaho 343, 345, 144 P.3d 597, 599 (2006)). As such, "[f]indings are competent, so long as they are supported by substantial, albeit possibly, conflicting, evidence." *Doe v. Doe*, 148 Idaho 243, 246, 220 P.3d 1062, 1065 (2009) (quoting *Roe v. Doe*, 142 Idaho 174, 177, 125 P.3d 530, 533 (2005)) "Substantial, competent evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Doe,* 150 Idaho at 49, 244 P.3d at 193 (quoting *Doe*, 143 Idaho at 345–46, 144 P.3d at 599–600). This Court "must conduct an independent review of the record, 'but must draw all reasonable inferences in favor of the magistrate court's judgment, as the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties.'" *In Interest of Doe I*, 163 Idaho 274, 277, 411 P.3d 1175, 1178 (2018) (quoting *In re Doe (2014-23)*, 157 Idaho at 923, 342 P.3d at 635.

## IV. ANALYSIS

In this case, the magistrate court found that Father neglected his minor children by failing to comply with his case plan. The magistrate court also found that termination of Father's parental rights was in the best interests of the children because he failed to complete the case plan and resolve the issues that brought the children within the Department's custody and the children made significant progress in their current placement with the foster parent.

On appeal, Father argues that some of the court's factual findings are unsupported by the record and that the court did not properly consider how Father's period of incarceration affected his ability to comply with the case plan. Both of these issues address the magistrate court's findings on neglect and will be addressed in turn.

**A. The magistrate court's finding that Father neglected the children by failing to comply with his case plan is supported by substantial, competent evidence.**

The Idaho Code provides several statutory definitions of neglect. *See* I.C. §§ 16-1602(31)(a)–(d), 16-2002(3)(b).  Here, the magistrate court terminated Father's parental rights based on neglect under Idaho Code section 16-2002(3)(b) which provides:

> (b) The parent(s) has failed to comply with the court's orders or the case plan in a child protective act case and:

(i) The department has had temporary or legal custody of the child for fifteen (15) of the most recent twenty-two (22) months; and

(ii) Reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the department.

Finding neglect under Idaho Code section 16-2002(3)(b) requires the magistrate court to "find that the parent is responsible, whether directly or indirectly, for non-compliance with the requirements of a case plan." *Idaho Dep't of Health & Welfare v. Doe (2016-14)*, 161 Idaho 596, 600, 389 P.3d 141, 145 (2016) (footnote omitted). "This requirement reflects the reality presented by parents who engage in behavior that results in non-compliance with no apparent thought or consideration of the effect of that behavior upon the case plan." *Id.*

1. <u>There is substantial, competent evidence supporting the magistrate court's finding that Father neglected his children by failing to complete his case plan notwithstanding a few factual misstatements.</u>

In concluding that Father neglected his children, the magistrate court found by clear and convincing evidence that:

This case plan has been in effect for over 23 months, at the close of the evidence on March 16, 2018. . . . Father has simply not engaged or participated in the case at all until December of 2017. Father had minimal contact with the Minor Children until December 2017. He has not supported the Minor Children emotionally or financially in any way throughout this case. It is clear that the Parent's lack of action on this case plan to date has constituted neglect as to both parents.

The magistrate court also found that the children had continuously remained in the Department's custody since April 2016. This amounted to 21 months without reunification at the beginning of trial in January 2018. Father does not allege error based on the length of custody as stated in subpart (b)(i)–(ii) of section 16-2002(3)(b).

Instead, on appeal, Father attacks specific factual findings in the court's Memorandum Decision. Father argues the following findings are not supported by the record: (1) the children were subject to neglect and abuse at the time of removal from the home; (2) Father did not start his treatment until November or December 2017; (3) Father accrued approximately $3000.00 in back child support; (4) Father only visited the children once during first 12 months of the case plan; (5) Father only saw the children five times between March 2017 and December 2017; (6) Father did not support the children emotionally.

First, Father is correct that the basis for jurisdiction under the CPA was a stipulation to an unsafe housing environment rather than a finding of neglect or abuse. However, the children were first placed in the Department's protective custody after a law-enforcement officer declared them to be in imminent danger based on the condition of the home and Mother's statements about the children's exposure to domestic violence and drug use. Thus, the finding of neglect and abuse is supported by substantial, competent evidence. In any event, this finding has little bearing on the magistrate court's stated basis for terminating Father's parental rights: neglect by failure to complete a case plan under Idaho Code section 16-2002(3). As this Court has stated on prior occasions, "[s]tatutory grounds for termination of parental rights are independent, and if any one or more of the grounds for termination are found, termination may be granted." *Idaho Dep't of Health & Welfare v. Doe (2016-11)*, 160 Idaho 824, 833 n. 1, 379 P.3d 1094, 1103 n. 1 (2016) (quoting *Roe*, 142 Idaho at 179, 125 P.3d at 535). Even if the court's specific finding was unsupported, it is not statutorily relevant to the magistrate court's ultimate finding that Father neglected his children by failing to complete his case plan under Idaho Code section 16-2002(3)(b).

Second, Father points to E.D.'s testimony stating that he was in treatment in June 2017 to show that he was engaged in counseling prior to November or December 2017. Father is correct that E.D. testified that he participated in an intensive outpatient program prior to his incarceration in July 2017. This undermines the court's finding that "Father has simply not engaged or participated in the case at all until December of 2017." However, E.D. also testified that his time incarcerated was for a petit theft and trespassing. Likewise, at the time of trial, E.D. testified that Father had not completed the intensive outpatient program. So even accepting that Father participated 6 months earlier than the court's finding, 12 months are still devoid of effort by Father. Accordingly, this error does not negate the court's finding that Father's participation in the case plan was significantly delayed.

Third, Father is correct that the judge entered an order ceasing child-support obligations. This order is at odds with Father's testimony about owing $3,200 in child-support obligations on the children and the court's finding on child support. However, this specific finding was part and parcel of a broader finding that Father did not complete the case-plan task of financially providing for his children. This finding also stated that Father did not provide proof of income to the Department until trial and that he had only begun financially providing for the children once

7

he started work in October 2017. As D.W. testified, despite the case-plan task, Father provided proof of income for only 2 of the 12 months she carried the case. Therefore, even excluding the confusion regarding child-support payments, there is substantial, competent evidence supporting the magistrate court's finding that Father did not complete the task of financially supporting his children.

Fourth, Father is correct that D.W. testified that Father attended four out of a possible ten visits during the first year of the case plan. This testimony conflicts with the magistrate court's finding that Father only had one visit with his children in the first year of the case plan. However, D.W. also testified about why Father missed the six visitations:

Q. Did you discuss with him his attendance at visitation?

A. Yes.

Q. And why did he inform you he had stopped coming to those visitations?

A. Well, a great deal of it was due to lack of communication. We would have visits scheduled. He would not follow through with them. We could not obtain contact to schedule additional visitation with him. At times he forgot about visitation, or he would not be able to get to visitation but did not notify the Department of this.

Given this testimony, there is still substantial, competent evidence showing that Father's efforts at visitation were insufficient for case-plan compliance despite the fact that the magistrate court misstated the amount of times Father visited the children during the first year.

Fifth, Father correctly points out that K.S. testified that Father made six visits between March 2017 and December 2017. But this merely revises the magistrate court's finding that "Father only saw the children *approximately* 5 times from March of 2017 until December 2017." (emphasis added). Even so, K.S. testified that he had difficulties staying in contact with Father and that Father was inconsistent with visitation prior to December 2017. He also testified that Father's lack of transportation was not the root of the problem because "part of our services is we will pick him up and drive him, but I think that was an issue, but we could have worked through that." Given the language of the factual finding and the testimony presented, there is substantial, competent evidence supporting the conclusion that Father failed to adequately visit his children.

Lastly, Father points to K.S.'s testimony that Father was "attentive and nurturing" during visits as the "only non-bias[ed]" testimony to this fact. But D.W. also testified that during one of the Department's visits with both parents, Father was "disengaged" and "very hesitant." He "was

8

not sure what he needed to do during that visit, how to interact with the children. He mostly just stood at the edge of the visitation area." In addition, the children's foster parent testified about the visits supervised by K.S.:

> Q. And have those visits had any effect upon the children that you've noticed?
>
> A. I think to a lesser extent. [The younger child]–because they were so intermittent for a long time, in the summer we were going to meet [Father] at a park, and when I'm like, "Oh, your dad's here," [the child] went up to the wrong person and gave him a hug. He didn't recognize him. And now he often refers to the visitor, the person who supervises the visit, [K.S.], that's his other dad to where I think he's very confused as to who really is his dad.

As mentioned, "[i]f the trial court's findings of fact are based upon substantial and competent, although conflicting evidence, they should not be disturbed on appeal." *Doe I v. Doe*, 138 Idaho 893, 906, 71 P.3d 1040, 1053 (2003) (citing *Halen v. State*, 136 Idaho 829, 832, 41 P.3d 257, 260 (2002)). In light of D.W.'s and the foster mother's testimony, the magistrate court's finding on this issue is supported by substantial, competent evidence.

Having assessed the specific factual findings Father challenges, we return to the broader finding of neglect. Even if this Court accepts that some of the magistrate court's specific factual findings are not supported by substantial, competent evidence, there is nevertheless substantial, competent evidence to support the magistrate court's ultimate finding on neglect. At any rate, Father fails to challenge other findings which detail his shortcomings on the case plan.

For instance, Father does not challenge the finding that he used methamphetamine approximately six months prior to trial despite the case-plan task of abiding by the recommendations of his GAIN assessment. Nor does Father challenge the finding that he failed the task of participating in drug testing. Out of the required drug tests, Father tested negative only 7 times, tested positive for methamphetamine or benzodiazepine 17 times, and failed to attend 60 times. The court further found, among other findings, that Father failed to provide adequate housing for his children because he had lived in motels, a tent, and his mother's home. At the time of trial, he lived with three other adult males in a house that was not suitable for children. Thus Father also failed the task of allowing the Department to make home visits. While the court found that the Department made no home visits, D.W. did testify that the Department made one visit to Father's motel in Gooding county, but opined that it was "disheveled" with "belongings all over the place" and, though the physical space may have been appropriate for children, a motel was not "stable housing" as required by the case plan. Further, Father does not

9

challenge the findings that he failed to provide for children's educational or health needs. Nor does Father challenge the finding that he failed to successfully complete a parenting class and demonstrate the ability to apply those skills.

In conclusion, while Father is correct that some of the discrete factual findings in the magistrate court's memorandum decision are not supported by substantial, competent evidence, removing those errors does not reduce or alter the remaining evidence supporting the magistrate court's conclusions. The magistrate court's finding that Father neglected his children by failing to comply with his case plan is supported by substantial and competent evidence.

2. <u>Father has failed to show it was impossible for him to comply with the case plan</u>.

Father contends that the magistrate court erred by failing to take his periods of incarceration into account when it found he failed to complete his case plan because the time in custody made many of the tasks impossible for him to complete. In support, Father points to this Court's decision in *In re Doe (2016-14)*, 161 Idaho 596, 389 P.3d 141 (2016), as well as D.W.'s and E.D.'s testimony that his incarceration affected his ability to complete the case plan.

In *In re Doe (2016-14)*, this Court recognized impossibility as a defense to neglect for failure to comply with a case plan under Idaho Code section 16-2002(3)(b). 161 Idaho at 600, 389 P.3d at 145. There, a mother appealed the termination of her parental rights and argued that compliance with the case plan was impossible because she was incarcerated when the case plan was entered into. *Id.* at 599, 389 P.3d at 144. She also pointed out that she had completed as many of the tasks as possible while incarcerated. *Id.* While this Court held that impossibility may be asserted as a defense to neglect under section 16-2002(3)(b), it also cautioned that "willful noncompliance" is not the standard to assess failure to comply. *Id.* at 600, 389 P.3d at 145. Rather, the magistrate court "must find that the parent is responsible, whether directly or indirectly, for non-compliance with the requirements of a case plan." *Id.* (footnote omitted). This Court noted that "it is the role of the trial court, not this Court, to make the factual finding whether [the parent] bears responsibility for [the] failure to comply with the case plan." *Id.* at 601–02, 389 P.3d at 146–47.

When later interpreting *In re Doe (2016-14)*, this Court held that compliance with the case plan was possible even though the parent had various periods of incarceration. *Idaho Dep't of Health & Welfare v. Doe (2016-32)*, 161 Idaho 754, 759, 390 P.3d 1281, 1286 (2017). There, this Court distinguished *In re Doe (2016-14)* because the parent in the subsequent case: (1) was

not incarcerated at the beginning of the case plan; (2) was only incarcerated some of the time during the case plan; and (3) admitted fault for noncompliance with various tasks at trial. *Id*.

Turning back to the case at hand, the magistrate court made the follow findings regarding Father's incarceration:

> Father made no effort to complete any of the case-plan until approximately October 2017. Father was incarcerated, based upon his testimony for approximately 90 days, 30 days in Gooding County and the rest in Ada County for a total on 3 months during the duration of the CPA.

Thus, Father's argument that the court failed to consider his incarceration lacks foundation. The first sentence of the paragraph also implicitly finds that Father "bears responsibility" for the failure to comply with the case plan because he failed to make an effort. *In re Doe (2016-14)*, 161 Idaho at 601–02, 389 P.3d at 146–47.

In addition, Father's reliance on *In re Doe (2016-14)* is misplaced. Unlike that case, where the parent was incarcerated at the time the case plan was adopted, Father's situation is more akin to the parent in *In re Doe (2016-32)*. Father was incarcerated during portions of the case plan; a conservative estimate based on trial testimony indicates that Father was incarcerated 40% of the time during the first year of the case plan, but the district court's findings place the figure at 25% (3 months) based on his testimony. However, by his own admission, his incarcerations were the result of probation violations and driving without privileges. He also admitted to petit theft and trespassing convictions in Pocatello in December 2016. Thus, the resulting time in custody came from Father's decisions and actions during the pendency of the case plan.

Father also did not comply with the tasks that were within his ability. While Father is correct to point out that two Department social workers testified that his incarcerations made compliance more difficult, he fails to explain how that difficulty excuses his other shortcomings. Father admitted to: using methamphetamine during the case plan; failing to complete drug tests; failing to provide suitable housing for the children that the Department could visit, not contacting housing-assistance providers until July 2017; and not timely participating in parenting classes. Lastly, when asked why he had only recently begun work on his case plan, Father did not mention his incarceration, but blamed his non-compliance on transportation:

> Q. Don't any number of single parents raise children without the assistance of someone else?
>
> A. Oh, absolutely. I'm prepared to do so.

11

Q. Why haven't you done it until now?

A. Well, the last 2 years has been very difficult to get anything as—let me see how I can put this. Honestly, this case plan is a lot to get in order if you're trying to get on your feet alone, trying to deal with a broken heart, trying to deal with somebody—getting your kids back. I don't know how to put it exactly.

Q. Many of those tasks were time limited to like 30 days of getting them accomplished, and you haven't done that yet on some of those.

A. *To really look at this, what's really stopped me from making progress is—the truth—this is really the bottom line truth to—my links to getting to AA treatments and my links to getting a different life really has been based on transportation. If I had transportation, this would have been done months ago.* I mean, I had to wait for my driver's license.

How can I get to all my supports, the different recovery things, the things that I need if I don't have transportation? I can't. Half of the year is winter here. Losing my kids, losing [Mother], you know, it dropped me into a hole. And then trying to make all this work on top of it, it's kind of in a losing—nope. Can't make the case plan. It's not that hard now.

(emphasis added). This explanation stands in stark contrast to Father's inconsistent attendance at supervised visitation prior to December 2017 considering that K.S. testified that his company provides transportation.

Given all this, the magistrate court's finding that Father was responsible, whether directly or indirectly, for non-compliance with the requirements of a case plan is supported by substantial, competent evidence.

## V. CONCLUSION

In sum, the magistrate court's finding that Father neglected his children under Idaho Code section 16-2002(3)(b) by failing to comply with his case plan is supported by substantial, competent evidence and the magistrate court properly considered Father's periods of incarceration. The decree terminating Father's parental rights is affirmed.

Justices BRODY, BEVAN, STEGNER, and MOELLER **CONCUR**.