# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 47130

| | |
|---|---|
| In the Interest of:<br>**Jane Doe I and Jane Doe II,**<br>**Children Under Eighteen (18) Years of Age.**<br>-------------------------------------------------------<br>**STATE OF IDAHO, DEPARTMENT OF**<br>**HEALTH AND WELFARE,**<br><br>    Petitioner-Respondent,<br><br>v.<br><br>**JOHN DOE (2019-16),**<br><br>    Respondent-Appellant,<br><br>and<br><br>**GUARDIAN AD LITEM,**<br><br>    Guardian Ad Litem-Respondent. | Boise, October 2019 Term<br><br>Opinion filed: December 23, 2019<br><br>Karel A. Lehrman, Clerk |

Appeal from the District Court of the Second Judicial District, State of Idaho, Nez Perce County. Victoria Olds, Magistrate Judge.

The order of the magistrate court is <u>affirmed</u>.

Knowlton & Miles, PLLC, Lewiston, for appellant. Paul C. Alexander argued.

Lawrence G. Wasden, Idaho Attorney General, Lewiston, for respondent. Floyd L. E. Swanton argued.

Nolta Law Office, Lewiston, for respondent Guardian Ad Litem. Paige M. Nolta argued.

---

BURDICK, Chief Justice.

John Doe ("Father") appeals the magistrate court's termination of his parental rights to his minor children Jane Doe I ("B.L.S.") and Jane Doe II ("A.C.S."). On December 11, 2018, the Idaho Department of Health and Welfare ("Department") filed a petition to terminate Father's parental rights to B.L.S. and A.C.S. After a four-day trial, the magistrate court found by clear

and convincing evidence that termination was proper on the grounds of neglect and that termination was in the best interests of the children. The magistrate court also terminated the parental rights of Jane Doe ("Mother"), who filed a separate appeal regarding termination of her parental rights to B.L.S., A.C.S., and a third child, X.V.S. (not included in Father's appeal). On June 11, 2019, the magistrate court entered a final order terminating Father's parental rights. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal concerns the termination of Father's parental rights to his two minor children, B.L.S. (born March 25, 2008) and A.C.S. (born December 24, 2017). On Christmas Eve, 2017, the Department received a referral when A.C.S. was born prematurely at Gritman Medical Center in Moscow, Idaho. Mother's amniotic fluid had ruptured prematurely due to drug use. Tests confirmed that A.C.S. was prenatally exposed to methamphetamine. Shortly after her birth, A.C.S. was life-flighted to Sacred Heart Medical Center in Spokane, Washington for treatment.

On-call staff for the Department conducted an initial safety assessment and the Department's Region 2 Child Welfare Supervisor (Region Supervisor) met with Mother at Gritman Medical Center on December 27, 2017. Mother explained that she and Father had been in an on-and-off relationship for the past 20 years. At the time of the meeting, Mother and Father lived together in a camper on his family's farm near Kendrick, Idaho. Mother disclosed that she actively used methamphetamine and had used methamphetamine while pregnant with A.C.S. She also explained that she and Father used methamphetamine together in their camper, sometimes with their children present.

Mother described frequent incidents of domestic violence that occurred in the home. For instance, when the couple fought they would yell and throw appliances and other objects at each other. She also recalled an incident where the windshield of one of their vehicles had been shattered when an object was thrown at it during a fight. Mother also described an incident where Father "ripped the door off the hinges of the camper" during a "drug-induced altercation" and left it on the ground for days. During another incident, Father threatened to harm himself and Mother with a firearm while the children were "in the vicinity."

Based on the information Mother provided to the Region Supervisor and the rest of its investigation, the Department filed a petition to remove the children from the home under the Child Protection Act on January 2, 2018. The magistrate court granted the petition the same day

it was filed and scheduled a shelter-care hearing for January 4, 2018. At the hearing, Mother stipulated to the Department retaining custody of all three children on the basis of an unstable home environment. Father was not present, but attended a continued shelter-care hearing on January 8, 2018, where he also stipulated to jurisdiction due to an unstable home environment. B.L.S. was placed into foster care with one of Father's cousins and A.C.S. was eventually placed into foster care with Father's sister after a one-month stay with another foster family.

After an adjudicatory hearing where Father and Mother again stipulated to jurisdiction and custody, the Department worked with the parents to develop a case plan. Father agreed to the tasks in the case plan and it was adopted by the court on February 23, 2018.

Father's case plan contained tasks for him to complete that were designed with the goal of establishing "stability in his life so he is able to be a safe parent to his children" by living "a sober life, free of abuse and neglect for himself and his children." The first task in Father's case plan required him to complete a substance abuse assessment (GAIN-I assessment) and comply with the recommendations of the treatment provider. Father was supposed to begin the first task no later than 15 days from the date the case plan was approved. The second task required Father to establish and maintain sobriety, complete random urinalysis tests (UAs) at the request of Department staff, and self-report barriers to attending treatment or maintaining sobriety. The third task required Father to attend and participate in mental health services. The fourth task required Father to demonstrate stability in his housing status by establishing sober housing. Father's fifth task required that he demonstrate the ability to meet his own basic needs as well as the needs of his children. This task included the requirement that he demonstrate financial stability through continued employment or accessing other resources to ensure his and his children's needs were met. Father's sixth task required that he participate in all scheduled visitation with his children and demonstrate his ability to recognize the needs of his children by responding to them in an age-appropriate manner. The seventh task required him to actively participate in all reunification services with his children. The final task required Father to address the domestic violence and relationship conflict with Mother if they planned to stay together. The case plan listed individual counseling, anger-management evaluations, couples counseling, and parent counseling as possible services to be used in accomplishing this task.

The magistrate court held review hearings in May, June, and September of 2018 to evaluate the parents' progress on their case plans, the status of the children in their foster-care

3

placements, and the Department's reunification efforts. At a review hearing on October 29, 2018, the Department requested an early permanency hearing on the grounds that both parents had made little progress on their case plans. Agreeing that the parents had made very little progress up to that point, the magistrate court moved the permanency hearing up from December 28, 2018, to November 26, 2018. At the permanency hearing, the magistrate court approved a permanency plan that sought termination of parental rights and relative adoption with the foster parents as the primary goal for each child.

The Department subsequently filed a petition to terminate the parental rights of both Mother and Father on December 11, 2018, approximately 11 months after the children had been placed in the Department's custody. At the time of the trial, Father was renting a house in Kendrick and both he and Mother were living there together. The Department's petition asked the magistrate court to terminate Father's parental rights on the following grounds:

### COUNT I

The children are neglected as defined in I.C. §§ 16-2005(1)(b), 16-2002(3)(a), and 16-1602(31)(a) [because they] are without proper parental care and control, and/or subsistence, medical and/or other care or control necessary for their well-being because of the conduct and/or omission of their parents, and/or their neglect or refusal to provide [for] them . . . .

### COUNT II

The children are neglected as defined in I.C. §§ 16-2005(1)(b), 16-2005(1)(d), 16-2002(3)(a), and 16-602(31)(b) because their parents are unable to discharge their responsibilities to and for them and, as a result of such inability, the children lack the parental care necessary for their health, safety and/or well-being. Such inability will continue for a prolonged indeterminate period . . . .

### COUNT III

The parents have neglected the children as defined in I.C. § 16-2005(1)(b) because the parents have failed to comply with the Court's orders and/or the case plan in a Child Protective [A]ct case. [The children] have been in the custody of the Idaho Department of Health and Welfare since their removal on January 2, 2018.

4

After a four-day trial,[1] the magistrate court made the following findings by clear and convincing evidence: the Department had legal custody of the children for 15 of the most recent 22 months without reunification occurring; Father failed to comply with the case plan, failed to provide proper parental care and control for his children, and is unable to discharge his parental responsibilities; and termination of Father's parental rights was in the best interest of B.L.S. and A.C.S.

The magistrate court entered a final order terminating Father's parental rights to B.L.S. and A.C.S. on June 11, 2019. Father timely appeals.

## II. ISSUES ON APPEAL

1. Did Father properly preserve his argument that Idaho Code section 16-1622(2)(g)(i) caused the magistrate court to violate his right to due process?

2. Is the magistrate court's decision to terminate Father's parental rights to B.L.S. and A.C.S. supported by substantial, competent evidence?

## III. STANDARD OF REVIEW

Under Idaho Code section 16-2005(1), a court may terminate parental rights "if it finds that doing so is in the best interests of the child and that at least one of five grounds for termination is satisfied." *In re Doe (2014-23)*, 157 Idaho 920, 923, 342 P.3d 632, 635 (2015). The grounds set out by the trial court for terminating parental rights "must be proved by clear and convincing evidence." *In re Doe (2013-15),* 156 Idaho 103, 105–06, 320 P.3d 1262, 1264–65 (2014) (citing *Matter of Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991)); I.C. § 16-2009. To meet the clear-and-convincing standard, there must be "evidence indicating that the thing to be proved is highly probable or reasonably certain." *Matter of Doe II*, 165 Idaho 199, 202, 443 P.3d 213, 216 (2019) (quoting *In re Adoption of Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006)).

On appeal, this Court must conduct an independent review of the record, but "must draw all reasonable inferences in favor of the magistrate court's judgment, as the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties." *In re Doe (2014-23)*, 157 Idaho at 923, 342 P.3d at 635 (quoting *Doe v. Doe*, 150 Idaho 46, 49, 244 P.3d 190, 193 (2010)). When a magistrate court has applied the clear and convincing standard, this Court "will not disturb the

---

[1] The first three days of the trial took place on February 28, March 1, and March 5, 2019. Mother gave birth to a fourth child on March 21, 2019, and the fourth day of the trial was continued from March 25 to May 2 at the request of the parents.

magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision." *Doe*, 150 Idaho at 49, 244 P.3d at 193. "Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation and internal quotations omitted).

## IV. ANALYSIS

### A. Father failed to preserve his argument that Idaho Code section 16-1622(2)(g)(i) caused the magistrate court to violate his right to due process.

Father argues that an apparent difference between 42 U.S.C. § 675(5)(E)(i) and Idaho Code section 16-1622(2)(g)(i) caused the magistrate court to violate Father's due-process rights by holding a permanency hearing 11 months into the case. However, Father raises this issue for the first time on appeal.

"Generally, an issue presented on appeal must have been properly framed and preserved in the court below." *Fed. Home Loan Mortg. Corp. v. Butcher*, 157 Idaho 577, 581, 338 P.3d 556, 560 (2014) (citations omitted). "The Court will not consider issues that are raised for the first time on appeal." *Id.* (citing *Sadid v. Idaho State Univ.*, 151 Idaho 932, 941, 265 P.3d 1144, 1153 (2011)).

At the October 29, 2018, hearing, Father objected to moving the permanency hearing from December 28, to November 26, 2018. Father's objection was on the grounds that he was seeking inpatient treatment at the time of the hearing and that it was too early to decide whether to move up the permanency hearing date. Then, at the permanency hearing itself, Father objected again, arguing it was too early to change permanency goals from reunification to termination and adoption. Father argued there that he was now receiving inpatient treatment for his drug addiction, and, in light of his recent progress, the court should refrain from changing the permanency goals.

Father did not argue at either hearing that moving up the permanency hearing would violate his right to due process. He did not mention 42 U.S.C. § 675(5)(E)(i), let alone argue that it was substantively different than Idaho Code section 16-1622(2)(g)(i). In fact, Father provided no legal authority in the record below to support his argument that moving up the permanency hearing was improper. Therefore, Father failed to preserve his due process argument for appeal. We will not find error in a district court's decision on an issue it did not have the opportunity to address. *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019) ("We will not hold that

6

a trial court erred in making a decision on an issue or a party's position on an issue that it did not have the opportunity to address.").

Even though Father's failure to preserve his argument is dispositive in this case, we nevertheless address it to provide guidance should similar arguments be made in the future. Had Father properly preserved his argument, it would fare no better on the merits. Father argues that 42 U.S.C. § 675(5)(E)(i) creates an implied policy of "patience and extra time for parents if family members, at the state's option, are caring for the children . . . ." Under Father's interpretation, Idaho Code section 16-1622(2)(g)(i) does not contain the same "policy of patience" due to textual differences between the Idaho statute and its federal counterpart. This reasoning leads Father to conclude that the magistrate court violated his right to due process because it was unable to consider the implied "policy of patience" when deciding whether to move up the permanency hearing. However, the statutes impose requirements on the Department, not the magistrate court, so Father misunderstands the mechanics of both statutes.

To illustrate, the federal statute provides in relevant part:

> In the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months . . . . the State shall file a petition to terminate the parental rights of the child's parents . . . and, concurrently, to identify, recruit, process, and approve a qualified family for adoption, unless –
> > (i) *at the option of the State, the child is being cared for by a relative.*

42 U.S.C. § 675(5)(E)(i) (emphasis added).

The Idaho statute on the other hand, is worded as follows:

> If the child has been in the temporary or legal custody of the department for fifteen (15) of the most recent twenty-two (22) months, the department shall file, prior to the last day of the fifteenth month, a petition to terminate parental rights, unless the court finds that:
> > (i) *The child is placed permanently with a relative.*

I.C. § 16-1622(2)(g)(i) (emphasis added).

Idaho Code section 16-1622(2)(g) serves to impose a requirement on the Department, not any determination made by the magistrate court. Specifically, the statute requires the Department to file a petition to terminate parental rights if a child has been in their custody for 15 of the most recent 22 months without reunification occurring. Section 16-1622(2)(g)(i) serves as an exception to that rule, relieving the Department of the requirement if the child has been placed

with a relative. In other words, the exception gives the Department the option of declining to file a petition to terminate parental rights under certain circumstances. It does not have any bearing on any decision made by the magistrate court.

Furthermore, any perceived difference between Idaho Code section 16-1622(2)(g)(i) and 42 U.S.C. 675(5)(E)(i) may present an issue of whether Idaho's plan for foster care and adoption assistance qualifies for federal funding, but it does not present an issue of Father's right to due process. *See* 42 U.S.C. 670. (explaining that 42 U.S.C. 675(5)(E)(i) is part of a federal statutory scheme designed to provide states with federal funding if they implement programs consistent with 42 U.S.C. 670 *et seq.*). Thus, even if Father had preserved his due-process argument for appeal, it would have failed on the merits.

**B. The magistrate court's decision to terminate Father's parental rights is supported by substantial, competent evidence.**

Termination of parental rights requires a two-part finding that (1) at least one of the five statutory bases for termination has been met, and (2) termination is in the best interests of the child. *In Interest of Doe I*, 163 Idaho 274, 277, 411 P.3d 1175, 1178 (2018) (citing *In re Doe (2014-23)*, 157 Idaho 920, 923, 342 P.3d 632, 635 (2015)); *see also* I.C. § 16-2005(1). We discuss each part below.

1.  Bases for termination

Idaho Code section 16-2005(1) lays out the five possible statutory bases for termination of parental rights. "Each statutory ground is an independent basis for termination." *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007) (citation omitted).

The relevant statutory basis for termination in this case is neglect. *See* I.C. § 16-2005(1)(b). "Neglect" can be established in a number of ways, including: by failing to comply with the case plan under Idaho Code section 16-2002(3)(b), failing to provide proper parental care and control under Idaho Code section 16-1602(31)(a), and inability to discharge parental responsibilities under Idaho Code section 16-1602(31)(b). The magistrate court found, by clear and convincing evidence, that Father neglected B.L.S. and A.C.S. as defined under all three statutes. We review each finding in turn.

i. Substantial, competent evidence supports the magistrate court's finding that Father neglected his children as defined by Idaho Code section 16-2002(3)(b).

The magistrate court found by clear and convincing evidence that Father neglected his children under Idaho Code section 16-2002(3)(b). That section provides that a child is "neglected" where:

The parent(s) has failed to comply with the court's orders or the case plan in a child protective act case and:

(i) The department has had temporary or legal custody of the child for fifteen (15) of the most recent twenty-two (22) months; and
(ii) Reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the department.

I.C. § 16-2002(3)(b). To find neglect under Idaho Code section 16-2002(3)(b), the magistrate court must "find that the parent is responsible, whether directly or indirectly, for non-compliance with the requirements of a case plan." *Matter of Doe*, 164 Idaho 875, 879, 436 P.3d 1224, 1228 (2019) (citing *Idaho Dep't of Health & Welfare v. Doe (2016-14)*, 161 Idaho 596, 600, 389 P.3d 141, 145 (2016)). "This requirement reflects the reality presented by parents who engage in behavior that results in non-compliance with no apparent thought or consideration of the effect of that behavior upon the case plan." *Id.*

In this case, the magistrate court made its findings of fact in thorough detail. In applying Idaho Code section 16-2002(3)(b), the magistrate court first found that "[t]he Department has had custody for fifteen of the most recent 22 months, and reunification was not accomplished by the last day of the fifteenth month."

Here, the Department took custody of the children on January 2, 2018, and the magistrate court ordered termination of Father's parental rights on June 11, 2019. Therefore, the children had been in the custody of the Department for 15 of the most recent 22 months without reunification occurring.

After addressing the timing requirements, the magistrate court found that Father failed to comply with the case plan, it explained:

Father had not completed one Case Plan task by the completion of trial, and has not substantially complied with any Case Plan task over the life of this case. He did not complete a GAIN assessment until July 2018 (very late), and failed to follow any of its recommendations. He was discharged from treatment for

9

lack of attendance. Father continued to actively use methamphetamine, thus causing him to miss supervised visitations (especially those with ACS), individual and group counseling, random UAs, and office meetings. Father failed to engage in treatment until the eleventh hour.

Father's continued sobriety is in question. Questions remain based on his late entry into outpatient treatment, his declining a hair follicle test and his refusal to submit to UAs until April 2019. Even if sober, Father has not been sober long enough to prove such will be maintained. Father was placed in modified outpatient treatment based on his need to work and the distance between Kendrick and Lewiston. Father has done nothing to address his mental health. He has downplayed and largely ignored the domestic violence in the household, and discounts its damaging effect on the children.

Father seems to be in denial about the negative affect that his volatile, violent, relationship with Mother had on the household. Until Father addresses his own mental health and co-dependency issues through individual counseling (not substance abuse or couples counseling), the children remain at risk.

Simply put, Father did not comply with his case plan.

Father contends that it was impossible for him to fully comply with a number of tasks in his case plan. He argues it was impossible to comply with the first task because he was unable to enter inpatient treatment due to reasons beyond his control. Specifically, he argues that through no fault of his own, the funding window lapsed a day early, preventing him from seeking inpatient treatment. The window was supposed to last for 30 days.

However, Father admits that he failed to obtain a GAIN-I assessment within the 15-day period provided for in the case plan. As to seeking treatment, Father waited until the 29th day of his 30-day funding window before attempting to enter inpatient treatment. There was testimony at trial that Father would have qualified for funding had he called sooner, instead of waiting until one day before the funding window closed.

Father also contends that it was impossible to comply with the third, fifth, and eighth tasks in his case plan. He claims that he could not engage in mental health treatment until he obtained substance abuse treatment. He argues that the couples counselor told him to seek substance abuse treatment before continuing couples counseling. By the time he completed inpatient treatment, he further claims, it was too late to engage in mental health treatment or address the domestic violence issues between him and Mother because the permanency goal had

10

already been changed. Likewise, he argues that his treatment-related obligations prevented him from working 40 hours a week to reach financial stability in time.

However, while these facts may have made compliance more difficult, they did not render compliance impossible. Father could have sought individual mental health counseling at any point during the life of his case plan. To the extent that Father argues he did not have enough time to work his case plan, he is responsible for his own failure because he waited until the 11th month before attending inpatient treatment. Had Father obtained his GAIN-I assessment within the original 15-day window and thereafter entered into inpatient treatment, he would have had more time to complete the other tasks in his case plan such as seeking mental health treatment, obtaining financial stability, and addressing the domestic violence in his relationship with Mother. Therefore, it was not impossible for Father to comply with any tasks in the case plan. His failure to do so stems largely from his lack of efforts during the first 11 months of the case.

In sum, substantial, competent evidence supports the magistrate court's finding that Father neglected B.L.S. and A.C.S. by failing to comply with his case plan under Idaho Code section 16-2002(3)(b).

ii. Substantial, competent evidence supports the magistrate court's finding that Father neglected his children as defined by Idaho Code sections 16-1602(31)(a) and 16-1602(31)(b).

The magistrate court also found by clear and convincing evidence that Father neglected his children under Idaho Code sections 16-1602(31)(a) and 16-1602(31)(b). A "neglected" child under Idaho Code section 16-1602(31)(a) is a child "[w]ho is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them . . . ." A "neglected" child under Idaho Code section 16-1602(31)(b) is a child "[w]hose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being . . . ." In determining whether a child is neglected under Idaho Code section 16-1602(31), the court "may consider both past and current conduct." *In Interest of Doe Children*, 163 Idaho 367, 373, 413 P.3d 767, 773 (2018) (citation omitted). This Court has recognized that evidence of drug problems (which interfere with parental abilities), unstable employment or housing, and incarceration all support a finding of neglect. *Matter of Doe Children*, 164 Idaho at 490, 432 P.3d at 39 (citing *Idaho Dep't of Health & Welfare v. Doe*

11

*(2016-32)*, 161 Idaho 754, 390 P.3d 1281 (2017)). Also, "infliction of perpetual domestic violence, even if not directed at the children, supports a finding of parental neglect as it provides for an unstable and dangerous home environment." *In re Doe*, 143 Idaho 343, 347, 144 P.3d 597, 601 (2006) (citation omitted).

In finding that Father neglected B.LS. and A.C.S. under Idaho Code sections 16-1602(31)(a) and 16-1602(31)(b), the magistrate court pointed to the "extreme volatility and violence surrounding the relationship between Mother and Father. . . ." The magistrate court explained that the violence occurred "over a substantial period of time," which, considered alongside the "severe substance use in the household" and instability in the home, established a sufficient basis for termination.

The evidence in the record supports the magistrate court's determination. The Department became involved in this case after receiving a referral that A.C.S. was born prematurely due to being prenatally exposed to methamphetamine. Mother testified that she and Father had used methamphetamine for years. Father's substance abuse counselor testified that Father self-reported methamphetamine use on five separate occasions during the time in which he was supposed to be working his case plan. Mother further testified about multiple instances of domestic violence between herself and Father that occurred in front of their children. Specifically, she testified she and Father fought frequently, sometimes escalating to the point of throwing appliances and other objects at each other. She testified that, on one occasion, Father wielded a firearm inside of the household, threatening to harm himself or her in front of one their children. She also described a "drug induced altercation," where Father ripped the door of their home off its hinges and left it on the ground. Father also had pending criminal charges for felony grand theft and several misdemeanors including injury to a child, possession of a controlled substance, and possession of drug paraphernalia at the time of trial. Therefore, substantial, competent evidence supports the magistrate court's findings of neglect under Idaho Code section 16-1602(31)(a) and 16-1602(31)(b).

2. Best Interests of the Children

As noted above, even if a statutory basis for termination of parental rights exists, termination is only proper if it is also in the best interests of the child. I.C. § 16-2005(1). Here, the magistrate court found by clear and convincing evidence that termination of Father's parental

rights was in the best interests of B.L.S. and A.C.S. Father argues that this finding is not supported by substantial, competent evidence. We disagree.

There is "no set list of factors a court must consider" when conducting a best-interests-of-the-child analysis. *Doe v. Doe*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015). However, there are a number of factors that a trial court may consider, including "stability and permanency of the home, unemployment of the parent, the financial contribution of the parent to the child's care after the child is placed in protective custody, improvement of [the] child while in foster care, the parent's efforts to improve his or her situation, and the parent's continuing problems with the law." *In re Doe*, 156 Idaho 103, 111, 320 P.3d 1262, 1270 (2014) (citations omitted). A trial court may also consider "whether the child's needs are being met, and the child's need for stability and certainty." *Idaho Dep't of Health & Welfare v. Doe*, 152 Idaho 797, 803, 275 P.3d 23, 29 (Ct. App. 2012) (citing *Doe v. Dep't of Health & Welfare, Human Servs. Div.*, 141 Idaho 511, 516–17, 112 P.3d 799, 804–05 (2005)).

The magistrate court stated the following in support of its conclusion that termination of both Mother's and Father's parental rights was in the best interests of the children:

> There is no basis to believe that Mother or Father can provide the safe, structured, and nurturing environment necessary to address these children's special needs. These needs arose due to the extreme neglect (both in utero and after birth) by both parents in the home due to their substance abuse, depression and domestic violence in the home in the presence of the children.

Here, substantial, competent evidence supports the magistrate court's decision that termination of Father's parental rights was in the best interests of B.L.S. and A.C.S. First, the magistrate court considered that B.L.S.'s needs were not being met when she was living with her parents. B.L.S.'s counselor testified that B.L.S. was forced into the role of peacemaker and caretaker while she lived with the family. He further testified about how instability in the home while she lived with her parents caused B.L.S. to suffer PTSD, adjustment disorder, anxiety, and depression, which led to nightmares and flashbacks.

The magistrate court then considered that B.L.S. has substantially improved while in foster care. B.L.S.'s foster parent, who is also Father's cousin, testified that she had slowly taken over caring for X.V.S. so that B.L.S. could transition back into just being a kid again. She further testified that she noticed a positive change in B.L.S.'s behavior after B.L.S. allowed her to take

over as the caretaker for X.V.S. The frequency of B.L.S.'s nightmares and flashbacks also diminished significantly in foster care.

As for A.C.S., the magistrate court first considered the circumstances of her birth and Father's lack of a relationship with the child. Mother did not seek prenatal care for A.C.S. and she was born testing positive for methamphetamine. When she left the hospital and went into foster care, A.C.S. would frequently spit-up and experience diarrhea. A.C.S. also suffered developmental delays and had limited use of her arms as a result of prenatal exposure to drugs. Father's case worker testified that Father questioned his paternity of A.C.S. and failed to show up for many visits with her. This led the magistrate court to conclude that Father had not established a bond with A.C.S. Her foster parent testified, on the other hand, that A.C.S. requires extra nurturing and patience, which her family has given to A.C.S. since she was placed in their home.

The magistrate court also found that B.L.S. and A.C.S. need stable, structured, safe, and sober environments in order to thrive. B.L.S.'s counselor testified that it was best for B.L.S. to remain in an environment where she felt safe and secure. The guardian ad litem also testified that B.L.S. and A.C.S. need a stable and peaceful environment. The evidence just discussed, coupled with the evidence of Father's substance abuse, domestic violence issues, and mental health issues, provide ample support for the magistrate court's decision. Therefore, the magistrate court's determination that termination of Father's parental rights was in the best interests of B.L.S. and A.C.S. is supported by substantial, competent evidence.

## V. CONCLUSION

Substantial, competent evidence supports the magistrate court's findings that Father neglected his children and that termination of Father's parental rights was in the children's best interests. Accordingly, we affirm the magistrate court's order terminating Father's parental rights to B.L.S. and A.C.S. Costs are awarded to the Department.

Justices BEVAN, STEGNER, MOELLER, and TROUT, Pro Tem, **CONCUR.**

14